# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT

OF

# The State of Missouri,

AT THE

# OCTOBER TERM, 1877.

(*Continued from Vol. 65.*)

---

## THE STATE v. WIENERS, APPELLANT.

1. **Murder in the Second Degree** is the wrongful killing of a human being with malice aforethought, but without deliberation. It is where the intent to kill is, in a heat of passion, executed the instant it is conceived, or before there has been time for the passion to subside.

    **Heat of Passion.** This phrase is here used, not in its technical sense, but to denote a condition of mind contra-distinguished from a cool state of the blood.

    **Malice:** MALICE AFORETHOUGHT. Malice is the intentional doing of a wrongful act without just cause or excuse. As an element of the crime of murder malice aforethought signifies that the homicide has been intentionally committed with malice.

    **Deliberation** does not mean brooded over, considered, reflected

| 66 | 13 |
| --- | --- |
| 98 | 448 |
| 66 | 13 |
| 39a | 488 |
| 66 | 13 |
| 102 | 387 |
| 102 | 629 |
| 66 | 13 |
| 103 | 208 |
| 66 | 13 |
| 107 | 350 |
| 66 | 13 |
| 108 | 151 |
| 66 | 13 |
| 109 | 672 |
| 66 | 13 |
| 115 | 482 |
| 66 | 13 |
| 121 | 146 |
| 66 | 13 |
| 136 | 125 |
| 66 | 13 |
| 147 | 555 |
| 66 | 13 |
| 152 | 70 |
| 66 | 13 |
| 162 | 677 |
| 66 | 13 |
| 167 | 297 |
| 66 | 13 |
| 171 | 1516 |
| 171 | 1517 |
| 171 | 1528 |
| 172 | 2648 |
| 66 | 13 |
| 178 | 1505 |

upon for a week, a day or an hour, but it means an intent to kill, executed, not under the influence of a violent passion suddenly aroused, amounting to a temporary dethronement of reason, but in the furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose.

2. **Case adjudged.** It having been clearly proven that defendant killed deceased intentionally, that there was no excuse or justification for the killing, that the provocation given by deceased was slight, and that deceased explained and apologized to defendant for it, it was held that it was not a case requiring instructions to be given to the jury defining murder in the second degree, and there being no complaint against the instructions in regard to murder in the first degree given by the trial court, the judgment of conviction was affirmed.

3. **Practice.** Neither the act of the prosecuting attorney in conferring with a witness for the defense, in relation to the case, nor his statement in argument to the jury that the murder was admitted by defendant were held, in the present case, sufficient to justify a reversal of the judgment.

4. **Evidence:** THE BONES OF THE DEAD MAN may be exhibited in evidence upon a trial for murder, for the purpose of showing to the jury the attitudes and relative positions of the deceased and defendant, when the fatal shot was fired.

*Appeal from St. Louis Court of Appeals.*

*Boyle & Delehanty* for appellant.

1. The circuit court erred in omitting to charge the jury as to murder in the second degree. Wag. Stat. 1106, § 30; *Hardy v. State*, 7 Mo. 609; *State v. Matthews*, 20 Mo. 55; *State v. Byrne*, 24 Mo. 155; *State v. Schoenwald*, 31 Mo. 147; *State v. Bryant*, 55 Mo. 75; 12 Ga. 142; *Foster v. People* 50 N. Y. 601; *Com. v. York*, 9 Met. 94, 115; *Gardiner v. People*, 6 Park. Cr. Rep. 190; 16 N. Y. 61; Lead. Crim. Cas. (2 Ed.) 332; 2 Black. Com. (Shars. Ed.) 198; *Bratton v. State*, 10 Humph. 110; *Robbins v. State*, 8 Ohio St. 169; *Atkinson v. State*, 20 Tex. 531; Numbers Ch. 35; Deuteronomy Ch. 19; *Bower v. State*, 5 Mo. 380; *Com. v. Crause*, 4 Clark (Penn. L. J.) 503; *Fouts v. State*, 4 Green. (Iowa) 500; *Territory v. Stears* 2 Mont. 324; *Craft v. State*, 3 Kan. 451; *Bivens v. State*, 11 Ark. 455; *Fahnestock v. State*, 23

Ind. 231; *People v. Batting,* 49 N. Y. 398; *State v. Ingold,* 4 Jones 222; Whart. Am. Law of Hom. 369; *Shoemaker v. State,* 12 Ohio 44, 53; *Com. v. McEwen,* 1 Clark (Penn. L. J.) 140.

2. The bones of the deceased and the bullet found imbedded therein were not proper evidence, and should not have been exhibited to the jury. It has been an immemorial usage in criminal trials in this country and Great Britain, to introduce in evidence skulls, bones, clothing, etc., of a deceased person where the *corpus delicti* is in doubt; but we have yet to find a single case or principle, after diligent research, sustaining the production of such evidence when the killing is admitted, as charged in the indictment, and more especially as in the case at bar, when the coroner witness indicated the precise location of the wound and direction of the bullet, on the neck of the presiding judge in the trial court. Steph. Dig. Ev. Art. 140; *State v. Brown,* 1 Mo. App. Rep. 87; *State v. Holmé,* 54 Mo. 160; *Clark v. Vorce,* 19 Wend. 232. •

3. The *ultra* professional conduct of the circuit attorney in conferring before the trial with Crum, one of the witnesses for the defense, worked a surprise upon defendant's counsel, and prejudiced defendant. Gra. & Wat. on New Trial 874, 875 and note; *Ibid* 1009; Hilliard on New Trial, (2 Ed.) 521, 544; *Todd v. State,* 25 Ind. 213; *Phillips v. State,* 29 Ga. 105; *Peers v. Davis,* 29 Mo. 184; *Carey v. King,* 5 Ga. 75; *Com. v. Benesh,* Thatch. Crim. Cas. 687.

4. The statement of the circuit attorney in his argument to the jury that defendant admitted the murder, prejudiced defendant upon the trial, and is sufficient ground for a reversal. 2 Broom & Had. Com. 486; *Gould v. Moore,* 40 N. Y. 395; *State v. Kring,* 64 Mo. 591; *State v. Reilly,* decided by the St. Louis Court of Appeals (1877); *Sullivan v. People,* 31 Mich. 4; *Jenkins v. N. C. Ore Dres. Co.* 65 N. C. 564; *Devries v. Haywood,* 63 N. C. 53; *Com. v. Smith,* 30 Leg. Intell. 201, (160); 1 Bright. (Pa.) Dig. 506.

*J. L. Smith*, Attorney-General, for the State.

1.  The criminal court did not err in refusing to instruct the jury as to murder in the second degree. The testimony shows clearly that the homicide was committed under such circumstances as to constitute the crime of murder in the first degree, and no other, and the criminal court therefore very properly, by its instructions, confined the attention of the jury to that grade of homicide. *State v. Lane*, 64 Mo. 319; *State v. Foster*, 61 Mo. 549; Wag. Stat. p. 445, §§ 1, 2; *State v. Schoenwald*, 31 Mo. 147.

2.  The criminal court did not err in overruling the motion for a new trial on the ground, as therein alleged, of surprise. Because if the witness Crum had testified to every fact stated in the affidavit and motion in relation to previous threats of the deceased, and the defendant and other witnesses had testified that such threats had been communicated to defendant previous to said homicide, still such testimony could not have been admitted, or, if admitted, would have been excluded, for the reason, that the testimony of all the witnesses shows that defendant, by his own voluntary conduct, sought the difficulty in which deceased was killed, and that the defendant was the sole aggressor therein. *State v. Hays*, 23 Mo. 287; *State v. Brown*, 63 Mo. 439.

3.  The criminal court did not err in admitting the testimony of the coroner and the exhibition of a portion of the vertebral column of the deceased. *Gardiner v. People*, 6 Parker Crim. R. 155. (See page 200.)

*L. B. Beach*, Circuit Attorney, for the State.

1.  Is there any element of murder in the second degree in this case? If there is not, then the court was right in confining the attention of the jury to murder in the first degree. An inspection of the evidence will show this case to be a clear case of murder in the first degree,

without an extenuating or justifying circumstance, without palliation or excuse. The indictment is for murder in the first degree, and is founded on paragraph 1, article 2, Wag. Stat. 445. Now, what is the legal meaning of the words used in this section as applied ·to this case? Willfully, means intentional, that is, not accidental. Deliberately, means in a cool state of the blood, that is, not in a heat of passion caused by a lawful provocation. Premeditatedly, means thought of beforehand, any length of time however short. Provocation to be sufficient to mitigate or extenuate homicide, as applicable to this case, should amount to personal violence or injury to the defendant—mere words of reproach, however abusive, degrading or grievous they may be, are no provocation sufficient to free the party killing from the guilt of murder

This was a willful, deliberate and premeditated killing without lawful provocation. Defendant and deceased were both employed at the Theatre Comique in the city of St. Louis, defendant as private watchman and deceased as assistant barkeeper. Defendant in size, was almost a giant, being in height at least six feet, and weighing between 200 and 225 pounds. Deceased was almost a child as compared with defendant, weighing only about 120 pounds, and being only five feet high. The bar where deceased was employed, was down stairs, and the theatre up stairs, and also back of the bar. Some one called at the office of the theatre for defendant, and no one else being handy, deceased was ordered to go up stairs and inform defendant that he was wanted at the office, which errand was duly performed by deceased. Defendant then came down, and having found that he had been called down in consequence of some person having called whom he disliked, he at once went into the bar where deceased was attending to his duties, and commenced upbraiding and calling deceased low names, for having called him down. Deceased said that he was not to blame, or could not help

it, as he did not know who had called, and had simply obeyed orders in going up and informing defendant that he was wanted at the office. Deceased, during the conversation in question used towards defendant some of the low names that defendant ·was using towards him. All this time defendant stood on the outside of the counter, and deceased behind the counter attending to his duties. Defendant then pulled out his pistol and tried to shoot the deceased, saying at the same time, "You God damned son of a bitch, I will kill you," and would undoubtedly have done so, but for the interference of friends. Up to this time, deceased, in no manner, shape or form, had given any provocation to defendant. Then some minutes afterward defendant still being on the aggressive, and calling deceased low names, reached over and struck deceased a blow in the face with his fist, and then, and not till then, did deceased do anything to protect himself. While smarting under the blow, he simply reached down and picked up an ordinary soda-water bottle, but did not use it. Almost immediately after defendant had struck deceased, he, defendant, drew his pistol and tried to shoot deceased, and two friends were unable to hold him, for he slips around his left hand and shoots the deceased dead upon the spot. Deceased had no weapon upon him, nor did he throw the bottle, but simply stood upon the defensive at the mercy of the defendant, who was seeking his life. Defendant immediately fled, remarking as he ran, "the God damned son of a bitch." There was no personal violence or injury to defendant. His life was not menaced or in danger; no one was fussing with him; no one attacking him; he was on the scene by his own free and voluntary act; he was using all the violence and threats; before he shot, he had committed an assault to kill, which of itself is a felony, and then he had followed that up by a battery on deceased; he was seeking a difficulty and urging it upon the deceased, only endeavoring to draw his victim into some overt act. From the time he first endeavored to shoot the deceased,

to the time that he actually did shoot him, some fifteen minutes elapsed; he had ample time then to deliberate; he had had no lawful provocation, no lawful heat of passion, and therefore the act was deliberate.

Defendant did not ask for an instruction upon the second degree. The bill of exceptions, the evidence, the affidavit for a continuance, the affidavits of the defendant's counsel, all show that the only defense set up and pleaded was self-defense. Defendant's counsel announced all through the trial that their plea was self-defense. To use their own words, as will be seen in the record: "We admit the killing, but claim that it was done in self-defense."

2. It is claimed by defendant's counsel that the vertebral column ought not to have been exhibited to the jury, because "they had admitted the killing in manner and form as charged in the indictment." The State had the right to submit all the facts to the jury, the time, the place, the circumstances, and every fact tending to show all the elements of murder in the first degree. The officer of the State must be the one to judge as to the State's theory. In a case of murder in the first degree, it is proper for the State to show all the surrounding circumstances, the place of the murder, the difference in the sizes of the two men, the size of the pistol, the size of the bullet, the position of the parties, where the deceased was shot, whether in front, side, or back of the neck. Defendant claimed at the trial that the act was done in self-defense; then was it not proper for the State to show that the deceased was shot, not in the front of the neck, but towards the back, thereby showing the position of the parties at the time?

HENRY, J.—The defendant was indicted for the murder of Americus V. Lawrence, and convicted of murder in the first degree. On the appeal to the St. Louis Court of Appeals, the judgment on that verdict was affirmed, and he has appealed to this court.

The principal ground of complaint is that the court

failed to instruct the jury in regard to murder in the second degree. It is difficult to determine under our statute and decisions what is murder in the second degree, and the difficulty is attributable in part to the misapplications of the terms "malice" and "premeditation," and partly to those sections of the statute defining manslaughter in the four degrees. "Malice" and "premeditation" have been properly defined by this court, but have been misapplied in the discussion of this question, by a failure to observe the particular features of the cases in which this court has applied those terms, as defined. "Malice is the intentional doing of a wrongful act without just cause or excuse." This definition is open to verbal criticism, for the intentional doing of a wrongful act is necessarily without just cause or excuse, for otherwise it would not be a wrongful act; so that those words are superfluous. It is also open to criticism as applicable to homicides. Take the case of an intentional killing at common law which the provocation, although not justifying or excusing, reduced to manslaughter. "It was a wrongful act intentionally done without just cause or excuse," and by this definition it was malicious, and having been intentionally committed, contained all the elements of murder at common law; yet we know that there were at common law inexcusable and unjustifiable homicides intentionally committed, which were but manslaughters. Lord Hale's definition of malice in fact "is a deliberate intention of doing any bodily harm to another whereunto by law he is not authorized." Hale's Pleas of the Crown, I Vol. 450. Malice is a condition of the mind, the existence of which is inferred from acts committed or words spoken. It is that condition of the mind which "shows a heart regardless of social duty and fatally bent on mischief." To constitute a killing murder there must be malice aforethought, not that the malice should be thought of beforehand, which would be absurd, as it is but a condition of the mind, but that the act, prompted by this malice, should be thought of before, and

it signifies properly a homicide, intentionally committed with malice. If one with malice assault another to chastise, and unfortunately kill him, unless there was an intention to kill, express or implied by law from the instrument used, or the nature of the chastisement inflicted, there could be no malice aforethought as to the killing, which was not in the contemplation of the party. To constitute murder, the killing must be with malice aforethought, that is, "an unlawful intention to take life must precede the killing."

It is impossible to construe properly the first and second sections of our act in relation to murder without a knowledge of the common law in regard to murder and manslaughter. Murder was thus defined by Sir Edward Coke, 3 Inst. 47: "Where a person of sound memory and discretion unlawfully killeth any reasonable creature, in being and under the king's peace, with malice aforethought." Manslaughter was the unlawful killing of another without malice express or implied. "Manslaughter, which is principally distinguishable from murder in this, that though the act which occasions the death be unlawful, or likely to be attended with bodily mischief, yet the malice, either express or implied, which is the very essence of murder, is presumed to be wanting in manslaughter, and the act being imputed to the infirmity of human nature, the correction ordained for it is proportionably lenient." [East's Pleas of the Crown, 1 Vol. 218.] Sec. 1. Wag. Stat. page 445, defines murder of the first degree, as follows: "Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglarly or other felony." By section 2: "All other kinds of murder at common law, not herein declared to be manslaughter, or justifiable or excusable homicide, shall be deemed murder in the second degree." The word malice is not used in either section, but is in-

cluded in the term murder, and malice must exist before
any homicide can be declared murder in either degree.
Can there be malice aforethought when there is no inten-
tion to kill? There are cases at common law with which
apparently the doctrine that an intent to kill is of the
essence of murder is in conflict, but the conflict is only ap-
parent. If one in perpetrating or attempting to perpetrate
a felony, kill a human being, such killing is murder,
although not specifically intended, for the law attaches
the intent to commit the other felony to the homicide.
The law conclusively presumes the intent to kill. "If a
person breaking an unruly horse willfully ride him among
a crowd of persons, the probable danger being great and
apparent, and death ensue from the viciousness of the ani-
mal, it is murder. For how can it be supposed that a per-
son willfully doing an act so manifestly attended with
danger, especially if he showed any consciousness of such
danger himself, should intend any other than the probable
consequences of such an act? But yet, if it appear clearly
to have been done heedlessly and incautiously only, and
not with an intent to do mischief, it is only manslaughter."
[East, 1 Vol. 231.] The cases of the unnatural son who
exposed his sick father to the air against his will, by rea-
son whereof he died—of the harlot who laid her child
under the leaves in an orchard, where a kite struck and
killed it—of the man who had a beast that was used to
do mischief, if he purposely turned it loose, though barely
to frighten people and make sport, and it killed a per-
son—of the workman who threw down a stone or piece of
timber into the street in a populous town, where people
were continually passing, and killed a person, were mur-
ders, for the law presumed the intent to kill, or rather
held that the parties intended the probable censequences
of their acts. These cases are considered in East's Pleas
of the Crown, under the head of homicide from a general
malice or depraved inclination to mischief, fall where it
may, in which cases the intent to kill is presumed. "The

act itself must be unlawful, attended with probable serious danger, and must be done with a mischievous intent to hurt people in order to make the killing amount to murder in these cases, for it is from these circumstances that the malice is to be inferred." " But if an unlawful and dangerous act, manifestly so appearing, be done deliberately, the mischievous intent will be presumed, unless the contrary be shown." [Vol. 1, 231, see also 235, 236.]

In every case of murder at common law there was an intent to kill either express or implied, and where all the circumstances showed, when the intent was not conclusively presumed, that no such intent existed, the homicide, if not justifiable or excusable, was but manslaughter. A and B, acquaintances, between whom no trouble has occurred and no ill-feelings exist, stand talking on the street. A tells B that he lies; B, with a heavy stick, the use whereof will not probably result in death, with no intention to kill, strikes A upon the head and kills him. Blackstone. and East say that the crime of which B is guilty is *manslaughter* and not *murder*. " Words of reproach, how greivous soever, are not provocatives sufficient to free the party killing from the guilt of murder, nor are contemptuous or insulting actions or gestures without an assault upon the person, nor is any trespass against land or goods. This rule governs every case where the party killing, upon such provocation, made use of a deadly weapon, or otherwise manifested an intention to kill, or to do some great bodily harm. But if he had given the other a box on the ear, or had struck him with a stick, or other weapon not likely to kill, and had, unluckily, and against his intention killed him, it had been but manslaughter, for no malignant intention can be collected from such acts." East's Pleas of the Crown, vol. 1, page 233. To the same effect is Blackstone's Com., 4 vol., 201.

As the above supposed case was but manslaughter at common law, it, of course, could not be murder in either degree, under our statute. On page 256, 1 East's Pleas of

the Crown, a case is stated seemingly in conflict with all the cases cited, and with the doctrine maintained by him, thus: "He who voluntarily, knowingly and unlawfully intends hurt to the person of another, though he intends not death, yet he is guilty of murder or manslaughter, according to circumstances, if death ensue. As if A intending to beat B, happen to kill him, if done from preconceived malice or in cool blood upon revenge, it will be no alleviation that he did not intend all the mischief that followed." But he immediately qualifies it so that it harmonizes with the other cases put by him and with his own docrine, thus: "But the nature of the instrument and the manner of using it as calculated to produce great bodily harm or not, will vary the offense in all such cases." If the beating, however wrongful, was neither with a deadly weapon nor carried to a degree evidently dangerous, and there was no intent to kill, but unfortunately death followed, the offense would amount only to manslaughter. [Bishop's Criminal Law, vol. 2, sec. 623.] " Is the act both wrongful and in its nature dangerous to life? This, in a large class of cases, is the test. Thus, when the defendant is willfully committing a mere criminal misdemeanor; yet if the misdemeanor is one endangering human life, the accidental causing of death is murder." [Bishop, 2 vol., sec. 617.] In section 718 the same learned author says: "The doctrine of these cases does not wholly exclude considerations of the intent. If the act were not calculated directly to be dangerous to life, yet if it were done with the motive of committing a misdemeanor, the offense would be manslaughter." But it is unnecessary to extend this discussion. As there can be no murder without malice, express or implied, so there can be no murder without an intention to kill, express or implied. This proposition we think fully sustained by the authorities cited. See also *The People v. Austin,* 1 Parker's Crim. Reports, 162.

What, then, is murder in the second degree? It is the wrongful killing of a human being with malice aforethought

but without deliberation. It is, where the intent to kill is, in a heat of passion, executed the instant it is conceived or before there has been time for the passion to subside. We do not use the phrase, "heat of passion" in its technical sense, but as a condition of mind contra-distinguished from a cool state of the blood. Take the case of A and B, who had been on friendly terms, but they have an altercation in which A calls B a liar, and with a pistol or other deadly weapon B instantly, in a passion engendered by the insult, kills him. This, at common law, was murder, but, lacking the element of deliberation, it is, under our statute, murder in the second degree. At common law there were instances of provocations not amounting to an assault upon the person which extenuated the guilt of homicide, " or, to speak more properly, they serve to explain the act and rebut the presumption of malice." East, 1 Vol. 235, where instances are given. See also *United States v. Wiltberger*, 3 Washington Circuit Court Rep., 521. Premeditation means thought of beforehand, even for a moment, and as an intent to kill must be preceded by an operation of the mind which produced that intent, it is argued plausibly that every intentional killing which is not excusable or justifiable must be murder in the first degree, because the malice exists if the act was without excuse. But this argument overlooks the consideration that not only premeditation, but malice aforethought and deliberation are necessary elements of murder in the first degree. Murder in the second degree is such a homicide as would have been murder in the first degree if committed deliberately, but having been committed in a passion, in obedience to a sudden impulse, engendered by a real or supposed grievance, and not for gain or pre-existing revenge, the law, out of consideration for the weakness of human nature, esteems it as a crime of lower grade than such willful, deliberate homicides, as in common parlance are denominated cold-blooded murders. " Premeditation" and "deliberation" are not synonyms, and a homicide may be premeditated with-

out being deliberately committed. " Malice aforethought," says Bishop in his Criminal Law, "is a technical phrase employed in indictments, and with the word *murder* distinguishes the killing called murder from what is called manslaughter." When our statute declares that " every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, &c., shall be murder in the first degree," it certainly meant that the "other kind of willful, deliberate and premeditated killing" should be of the nature of that perpetrated by lying in wait or by poison of the same willful, deliberate and premeditated character. The common law made no distinction betwixt the guilt of the poisoner, or the assassin who shot his victim from ambush, or the robber who killed for gain and the man who under the influence of a momentary passion engendered by a real or supposed grievance, on the instant that the insult or provocation was given, slew the supposed aggressor. The common sense of mankind makes a distinction and regards the poisoner and assassin with abhorrence and loathing, but while condemning the act of the man who slays in passion without sufficient cause, regards him as far less criminal than the man who murders for gain or poisons or assassinates for revenge. To this common sentiment of mankind our legislature has yielded and distinguished between such murders.

As was said by the supreme court of Kansas in *Craft v. The State of Kansas*, 3 Kansas 451, speaking of the provisions of the statutes of that state similar to ours : " To constitute murder at common law there must be malice prepense or aforethought, i. e., *an unlawful intention to take life must precede the killing*. But ' deliberation and premeditation ' were not necessary ingredients. The same penalty was provided for killing with malice aforethought, that was inflicted for malicious, deliberate and premeditated killing. The law recognized no degree of atrocity in the crime. The law-makers of this state, as did those of other

states, thought they ought to recognize some difference in the degree of malignity with which the killing was done, and upon that basis they undertook to divide murder at common law into two degrees, so that the punishment might, to some extent, be proportioned to the moral depravity manifested in the commission of the crime." Of murder in the second degree are also all those cases of murder at common law, in which there was no specific intention to kill, but the law presumed the intent to kill, which are not declared manslaughter in one of the four degrees by our statute, and not committed in perpetrating or attempting to perpetrate a felony, as provided by the first section of the statute.

Applying these principles to the case under consideration, should the court have instructed as to murder in the second degree? If the killing was deliberately done it was murder of the first degree. In every homicide, however great the provocation may be, if there be sufficient time for passion to subside and reason to interpose, it will be murder in the first degree. "The law assigns no limits within which the cooling time may be said to take place—every case must depend on its own circumstances." A purpose to kill may be conceived and deliberately executed, although but a very brief time elapse between the conception and the execution of the purpose. Deliberation does not mean brooded over, considered, reflected upon for a week, a day or an hour, but it means an intent to kill, executed by the party, not under the influence of a violent passion suddenly aroused, amounting to a temporary dethronement of reason, but in the furtherence of a formed designed, to gratify a feeling of revenge or to accomplish some other unlawful purpose. It is no easy matter to draw the line of distinction betwixt premeditation and deliberation. It is more easily conceived than expressed. Instances are more satisfactory than definitions.

The facts, as disclosed by the testimony here, are that prior to the 29th day of January, 1877, the defendant and

the deceased were on friendly terms: that about 11 o'clock
on the night of that day they quarreled in a saloon, in
which deceased was a bar tender, but what was the occasion
of that quarrel does not appear. Between 12 and 1 o'clock
the principal bar tender of the saloon adjoining the thea-
ter Comique in St. Louis sent the deceased, who was his
assistant, up stairs, to call Wieners down; Wieners was a
private watchman employed at that theater. The evidence
does not show what occurred between Wieners and Law-
rence up stairs, but Lawrence returned to the saloon, fol-
lowed by Wieners, who appeared to be angry. They
quarreled, each applied to the other approbrious epithets.
Wieners drew a pistol, and cursing the deceased threaten-
ed to kill him, but he was seized by a bystander and
induced to put back his pistol, and agreed to go home.
The altercation continued and Wieners struck Lawrence a
blow on the check—one witness says with his open hand—
another that it was with his fist, but whether with his
open hand or fist, it did not fell or stagger Lawrence, and
was evidently a very slight blow. Lawrence reached down
under the counter and brought up in his hand a soda water
bottle and was in the act of throwing it at Wieners when
the latter, who had drawn two pistols, holding one in each
hand, shot Lawrence with the pistol he held in his left
hand, being prevented from using the right by Litsch, who
had hold of him. Soon after the parties commenced the
quarrel, Lawrence told the defendant, in explanation of his
going to call him down, that he did it in obedience to or-
ders given by the head bar tender. The provocation given
by deceased was slight, and his explanation, which was, in
effect, an apology, should have been accepted by defendant
as satisfactory. The fixed purpose of the defendant to kill
Lawrence is apparent, and a circumstance, which of itself,
is conclusive that the killing was not done under the influ-
ence of uncontrollable passion is the character of the blow
given by him on the cheek of Lawrence. Why was such
a blow given? One in a towering passion such as will

mitigate a homicide does not measure the force of his blows. Wieners was a powerful and Lawrence a very diminutive man. With his fist he could have felled him; and the manner in which that blow was given, in the light of what afterwards occurred, evidenced a purpose on the part of defendant to provoke Lawrence to some act of aggression and then take his life, as announced by previous threats. When he struck Lawrence the latter had a right to defend himself, and the exercise of that right could afford defendant no excuse for killing him. So determined was he to take the life of Lawrence, that while his right hand in which he held a pistol was held by Litsch, so that he could not use it, with his left he fired the fatal shot over the shoulder of Litsch, who stood between him and Lawrence.

We have carefully examined the record to find evidence tending to mitigate the offense of which defendant was guilty, but have failed to discover a circumstance to indicate that it was other than a deliberate murder. That he intended to kill; that there was no excuse or justification for the killing; that the provocation was slight, and that the deceased explained and apologized for it, were clearly proved, and we should have to disregard all the authorities to hold that it was a proper case for an instruction in regard to murder of the second or manslaughter in any degree.

There was nothing in the alleged misconduct of the prosecuting attorney in interviewing the defendant's witness, or in the remark to the jury in his argument that the murder was admitted, to justify a reversal of the judgment. On these points the observations of the Court of Appeals, in its opinion, are apposite, and we adopt them as very clearly expressing our views. So of the exhibition to the jury of the bones of the vertebral column of the deceased. It served to show to the jury the attitudes and relative positions of the parties when the shot was fired. It was not an unnecessary parade of the bones of the dead man to excite prejudice against his slayer, but was legitimate and

proper evidence, and a party cannot, upon the ground that it may harrow up feelings of indignation against him in the breasts of the jury, have competent evidence excluded from their consideration.

We are all agreed that the judgment should be, and it is, accordingly affirmed.

AFFIRMED.