## THE STATE v. FRANK MYERS, Appellant.

**Division Two, June 29, 1909.**

1. **DEFENDANT: Cross-Examination: As to Being Married.** Cross-examination of any witness is not confined to a mere categorical review of the matters stated in the direct examination. Where defendant had testified in his direct examination that his wife had told him she had heard someone prowling about the house and to get his pistol and investigate, and for that reason he had in his pocket the pistol on the night of the homicide, it was not error for the State to inquire of him on cross-examination whether or not he was in fact married.

2. **MURDER: In Second Degree: Instruction.** An instruction informing the jury that murder in the second degree is the killing of a human being wilfully, premeditately and with malice aforethought, and then proceeds to correctly define those words, and in all respects in harmony with approved precedents, is correct.

3. **MANSLAUGHTER: Instruction: No Provocation.** Where there is no evidence of any personal violence inflicted upon the defendant before he fired the fatal shot, and he makes no pretense that he was laboring under any excitement or passion at the time, but expressly states that he shot deceased in order to protect his own life, no instruction on manslaughter in the fourth degree should be given. And where he testifies that the deceased bar-keeper, when he had refused to give .him his key, threw off his apron and said, "If that is what you came over here for, looking for trouble, you will get all you want of it," and that he stepped forward, leaned under the bar, and said, "Now travel, you s—o—a—b—, travel," and that as deceased said that and had stooped down under the counter on the opposite side defendant pulled his revolver and shot him while he was stooping over, there is no manslaughter in the fourth degree in the case, but the homicide was either done in self-defense, or was murder in the second degree. [Distinguishing State v. Grugin, 147 Mo. 39.]

## Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

Affirmed.

*Frank H. Farris* for appellant.

(1) Defendant is a competent witness in his own behalf, subject to cross-examination as to matters referred to in his examination in chief, and subject to contradiction and impeachment as other witnesses. R. S. 1899, sec. 2637. In the case of State v. Magraw, 74 Mo. 573, the prosecuting attorney was permitted to ask the defendant if he had not been convicted and sent to the penitentiary in Kansas under the name of Hallow, and the Supreme Court reversed the trial court, and in its opinion stated, "The cross-examination of defendant in a criminal case must be confined

to those matters referred to by him in his examination in chief;'' but it has been held in the case of State v. Miller, 100 Mo. 606, and State v. Taylor, 118 Mo. 159, that the witness may be asked a question similar to the one asked defendant in this case, not, however, for the purpose of showing that the witness has been convicted of crime, but as questions affecting the general credibility of the witness. State v. Porter, 75 Mo. 177; State v. Patterson, 81 Mo. 90; State v. Chamberlain, 89 Mo. 133; State v. Turner, 76 Mo. 350. It was prejudicial to the rights of defendant to undertake to show by cross-examination that his marriage was a common-law marriage, which, while recognized by our law as binding, is ofttimes repulsive to the public, depending largely upon their individual views of the marriage contract; and it was also prejudicial in attempting to show by cross-examination that defendant had entered into this common-law marriage with a married woman, which, if true, would make him guilty of adultery. State v. Hudspeth, 150 Mo. 28; State v. Westlake, 159 Mo. 677.; State v. Hathorn, 166 Mo. 239; State v. Kyle, 177 Mo. 663; State v. Miller, 190 Mo. 463; State v. Barrington, 198 Mo. 83. (2) The court failed of its own motion to give any instructions for manslaughter, and the defendant asked and the court refused instructions for manslaughter in the fourth degree, couched in different language and prepared from different views, which were authorized and warranted by the testimony. R. S. 1899, secs. 1833, 1834; 2 Bish. Crim. Law (6 Ed.), sec. 704; 1 Russ. Crimes (7 Am. Ed.), p. 580; State v. Brown, 64 Mo. 373; State v. Branstetter, 65 Mo. 149; State v. Partlow, 90 Mo. 626; State v. Elliott, 98 Mo. 156; State v. Howard, 102 Mo. 147; State v. Harrison, 147 Mo. 556; State v. Hudspeth, 159 Mo. 194; State v. McKinzie, 177 Mo. 710; State v. Todd, 194 Mo. 396; State v. Darling, 199 Mo. 197.

*Elliott W. Major,* Attorney-General, and *James T. Blair,* Assistant Attorney-General, for the State.

(1) On the cross-examination of the defendant, he was questioned as to the legality of his marriage to the woman to whom he had referred in his direct examination as his wife. Defendant had testified, in substance, that it was at his wife's instance and to protect her from some prowler that he put the pistol with which he killed Burroughs into his pocket on the night of the tragedy. The purpose of this testimony was to invest the weapon with a sort of sanctity by its use in the protection of wife and home, and to place defendant before the jury with the best of reasons for being armed. Having opened the way in this manner, he was properly subjected to cross-examination on the question as to whether he had a wife to protect. If he was, in fact, not married at all, it could have been properly shown to meet and destroy his claim of innocency of purpose in carrying the pistol with which he killed Burroughs. In such a case "cross-examination is not confined to a mere categorical review of the matters stated in the direct examination. It is a proper effort to test the truth of that evidence." State v. Miller, 156 Mo. 85; State v. Fisher, 162 Mo. 173. "Cross-examination from time immemorial has been the great test of credibility of any witness." State v. Miller, 190 Mo. 463; State v. McKinzie, 102 Mo. 632; State v. Barrington, 198 Mo. 81; State v. Cunningham, 154 Mo. 174. (2) The court's definitions of "murder in the second degree," "willfully," "premeditatedly," "malice," and "malice aforethought," are not subject to criticism. State v. Curtis, 70 Mo. 600; State v. Talbott, 73 Mo. 350; State v. Fitzgerald, 130 Mo. 420. (3) The question presented is, whether there was any evidence in the case on which to base an instruction for manslaughter in the fourth degree. (a) It is passion and hot

blood of the defendant which reduces the degree of criminality of the killing. Therefore, it seems that what the defendant saw and heard at the time should govern in determining whether there was ''reasonable provocation'' and consequent ''heat of passion,'' such as to characterize defendant's act as manslaughter in the fourth degree. State v. Holme, 54 Mo. 165. (b) In cases in which the facts were not wholly dissimilar to those of the case at bar, it was held that there was no manslaughter therein. State v. Wieners, 66 Mo. 23; State v. Howard, 102 Mo. 146; State v. Wilson, 88 Mo. 19. (c) Words alone, however insulting, cannot furnish that character of provocation which reduces the grade of the offense to manslaughter in the fourth degree. State v. Sansone, 116 Mo. 13; State v. Bulling, 105 Mo. 221; State v. Gordon, 191 Mo. 125; State v. McMullin, 170 Mo. 630; State v. Gieseke, 209 Mo. 343. Likewise as to contemptuous and insulting acts and gestures. State v. Gordon, 191 Mo. 125; State v. McKenzie, 177 Mo. 711; State v. Starr, 38 Mo. 277; State v. Edwards, 203 Mo. 543; State v. Elliott, 90 Mo. 355. (d) To have the effect to reduce the killing to manslaughter there must usually be personal violence offered defendant. State v. Starr, 38 Mo. 277; State v. Branstetter, 65 Mo. 154; State v. Wieners, 66 Mo. 23; State v. Edwards, 70 Mo. 483; State v. Reed, 137 Mo. 140. (e) It is true that ''If there is a present demonstration of impending violence, which alone would be sufficient, accompanying words, added to physical acts, may create such peril as will justify the killing of the aggressor or reduce it to manslaughter.'' State v. Elliott, 98 Mo. 157; State v. Howard, 102 Mo. 147. But in this last case, though conceding the rule, the court held it inapplicable. And in this case the rule is inapplicable. State v. Edwards, 203 Mo. 544; State v. Gartrell, 171 Mo. 521. (f) There were no antecedent circumstances to add to the provocation

offered deceased, nor were the words used by him, and the circumstances at the time, of that extremely outrageous character which would bring this homicide within the opinion in State v. Grugin, 147 Mo. 59. See State v. Gartrell, 171 Mo. 522. (g) There is no pretense by defendant that he was excited. Beyond the fact of the sudden shooting of Burroughs, neither his words nor acts indicate such "heat of passion" as the rule contemplates. State v. West, 202 Mo. 141; State v. Gartrell, 171 Mo. 522. Defendant best knew his purpose in firing the fatal shot and an instruction inconsistent with his testimony on that head should not have been given. State v. Reed, 137 Mo. 138; State v. Gartrell, 171 Mo. 522. And it is the "state of mind," and not the provocation, merely, which reduces the grade of the offense. Unless defendant shot in the "heat of passion" and had "reasonable provocation" therefor, there is no manslaughter of this character in the case. State v. Ellis, 74 Mo. 218. (h) Mere suspicion of injury will not reduce the grade of the offense. It will still be murder. State v. Holme, 54 Mo. 164.

FOX, J.—The defendant has brought this cause to this court by appeal from a judgment of the circuit court of the city of St. Louis, convicting him of murder in the second degree.

On the 6th day of November, 1907, there was filed in the circuit court of the city of St. Louis an information for murder in the second degree, duly verified by the assistant circuit attorney, charging the defendant, Frank Myers, with having killed Garrell Burroughs. This offense was charged to have been committed on October 5, 1907. Defendant was arraigned upon the charge and entered his plea of not guilty January 13, 1908. A jury was duly impaneled and sworn and the trial upon the evidence was then proceeded with.

The testimony developed upon the trial tends substantially to show the following state of facts:

That the defendant had been for some years engaged in conducting what was known as the "Western Hotel" on Third and Carr streets in St. Louis, Mo.; that deceased, Garrell Burroughs, had roomed at defendant's hotel "off and on probably for two years," and had roomed there during the months immediately preceding his death until the evening before that event occurred. On that evening he left defendant's place, but the evidence gives no reason for his removal. Burroughs had been a waiter in a restaurant at 1111 North Third street in St. Louis until about a month before the shooting. During that month he had been working as barkeeper in the saloon conducted by Louis Fisher at the corner of Broadway and Wash in St. Louis, and was on duty at that place on the night of Saturday, October the 5th, 1907. According to the evidence there had been no previous ill-feeling between dceased and defendant, unless it is to be inferred from the fact that defendant had retained the key of Burroughs' trunk when the latter removed from the Western Hotel, and the fact that the conversation immediately preceding the firing of the fatal shot is a little hard to explain, unless on the theory of a previous misunderstanding. At the time of the shooting there was in the saloon Myers, the defendant; Burroughs, the deceased; Clyde Speer, another barkeeper; P. J. Tillman, George King, Michael Brennan, William Knox and two unidentified men. The two last and King did not testify. At about 7:30 p. m. on the day mentioned, Tillman, Brennan and King were in the saloon where the killing took place and were engaged in disposing of their second round of drinks when the defendant, Myers, entered the place. The latter invited the three to drink with him. Spear was serving the drinks, and Burroughs, the deceased,

until this juncture, had been seated behind and near the north end of the bar. Knox entered the saloon about this time by the side door and defendant amended his invitation to drink so as to include Knox. At this time, or a moment previous, according to witness Tillman's version, deceased approached the center of the bar where defendant was standing, the bar being between the two, and said to defendant, "Have you got my keys?" Defendant answered, "Yes," and deceased said, "Let me have them," to which defendant rejoined, "If you want them, come and get them." Burroughs then said something in an angry, mumbling tone, which witness did not understand, threw off his apron and reached down under the bar, leaning over or stooping so that his whole body was below the level of the bar rail. Defendant instantly drew his pistol, stepped up to the bar, reached over it and fired one shot downward. Speer's account of the tragedy was that Myers and Burroughs were talking in a low voice and the only portion of the conversation he heard was Myers' remark that "the only way you can get it is to take it;" that he, the witness, turned to draw some beer and then heard the shot The tone used in the conversation did not seem angry, according to this witness. Michael Brennan's version is that Burroughs said to defendant, "You have got my key." "So Myers said he had it, or something to that effect, and I turned around, speaking to my friend."

"Q. What did you say Myers said? A. Myers said he had the key. So Garrell Burroughs asked him for it, and he said he wouldn't give it to him.

"Q. He wouldn't? A. Yes, sir; that is all I heard. I turned around to speak to my friend; and so they had some argument between the two of them. There was some altercation between them, which made hot words; whatever they were I couldn't understand, and Garrell Burroughs, the deceased, said something in a threatening attitude and went down, apparently

reaching for something behind the bar, and just as I turned around Frank Myers pulled his revolver out of his pocket and shot the man behind the bar.''

In explaining Burroughs' ''threatening attitude'' the witness declared that ''he,'' Burroughs, ''appeared 'sore,' '' and ''didn't have a pleasing face on him.'' This witness also testified that just after Burroughs ''went under the bar'' defendant stepped up, leaned over the bar and shot him.

The deceased had no weapon on his person when he was killed, and neither he nor defendant made any other demonstration than detailed above. Only one shot was fired and it proved almost instantly fatal, Burroughs never having regained consciousness, dying in the hallway to which he had been removed immediately after the shooting. The post-mortem developed that the bullet entered the body of deceased at the lower angle of the right shoulder blade, pierced both lungs and the aorta, and lodged on the left side of the body between the fifth and sixth ribs, ranging slightly upward and forward. The deceased was a young man about twenty-three or twenty-four years old. After shooting Burroughs, defendant left the saloon and returned to the Western Hotel, where he was arrested soon thereafter. The defendant had concealed the pistol with which Burroughs was shot under some steps in the alley back of the hotel. On being asked by the officers where the weapon was, he accompanied them to the alley, secured and delivered it to them.

Defendant's counsel was at some pains to lay a foundation for showing discrepancies between the testimony of witness Tillman on the trial in the circuit court and that given by him in the court of general sessions on the preliminary, but the proof of the testimony given by this witness in the last-mentioned proceeding was not made.

On behalf of defendant, William Knox testified that he had resided at Myers' hotel nearly three years, and was residing there at the time of the trial; that he and Burroughs had been roommates; that he was in the saloon at Broadway and Wash streets at the time Burroughs was shot on the evening of Saturday, October 5, 1907; that on entering he said to defendant, who was at the bar with others, "Myers, who is doing this?" The witness then gave this description of the occurrence: "And he asked me what I was going to have, I said, 'Beer,' and I walked towards the bar. As I did, Burroughs came forward where the cash register was, towards Myers, and he said, 'God damn you, have you got anything coming to you? If you came looking for trouble you are going to get what is coming to you.' And then I turned around. The other man put the beer on the bar, and as I turned my shoulder that way (indicating) to lift the beer with my left hand, Burroughs had turned the other way. He half turned, and he said to Myers, he said, 'God damn you, you are going to get what is coming to you,' and as I turned to take my beer, the shot was fired, but I could see it just as it passed my shoulder; I saw the glance of the gun as he stepped back. Mr. Myers stepped back from the bar, and I stepped on the rail and looked over, and he was lying on his face then." On cross-examination Knox said that he could not see Myers when the shot was fired, but saw Burroughs turn and then the shot "passed his left shoulder." He heard Burroughs say nothing, except as detailed on his direct examination. Knox admitted that at the coroner's inquest he testified that what he heard Burroughs say to Myers was, "If you come here looking for anything you can get it," but declared he then omitted the oaths out of regard for the mother, wife and sister of deceased.

Mrs. John Hill, for defendant, testified that she lived at the defendant's hotel; that the State's wit-

ness Tillman was also living there in October, 1907, and that on the night Burroughs was killed she met Tillman on the stairway in the hotel, and he told her that during the altercation which resulted in Burroughs' death the latter said to defendant, "If you are looking for trouble, you can get all you want of it, you son-of-a-bitch," and that deceased then stooped and put his hands under the bar and said, "Travel, you son-of-a-bitch, travel," and then Myers shot.

Lottie Noels, defendant's sister. testified that on the morning of the coroner's inquest held to investigate the killing of Burroughs, State's witness Tillman had told her in the presence of Mr. Morris, the then attorney of defendant, that immediately before he was shot Burroughs had said to defendant Myers, "God damn you, you are here looking for trouble, and you will get it." And that Burroughs then stooped or reached under the bar, saying, "Now, travel, you son-of-a-bitch, travel," and that then defendant fired.

John Hill testified that he lived at defendant's hotel and was living there on October 5, 1907, the date of the tragedy. That about 7 p. m. on that day defendant's wife came to defendant's room and told him she had been frightened by some one "walking around there," and asked defendant to go out and look into the matter; that she suggested he had better take his pistol, which defendant then took from the mantel and went upon his mission of investigation.

Defendant testified in his own behalf to the effect that for over three years he had been conducting the Western Hotel, 1035 North Third street; that deceased had lived at the hotel probably two years prior to his death, but had left the place the day before his death. That deceased carried a pistol habitually, and that he, defendant, had often seen it, and Burroughs had on three occasions left it with him for safe-keeping. He explained his taking his pistol to Fisher's saloon on the night of the tragedy there by saying

that he put it in his pocket at his wife's instance to investigate the doings of some prowler who had frightened her, and on his return from that errand had not thought of the pistol further, but had left it remaining in his pocket. He declared he had no intention of visiting the Fisher saloon when he left the house that evening, but that after he was out on the street it occurred to him that Speer, one of the bartenders at the saloon, owed him a small bill, and he then went down to collect it. Defendant's account of the occurrences immediately preceding the firing of the fatal shot is in these words: "I walked in the saloon, walked up to the center of the bar, and four men were in there that I knew, or three in there that I knew and two that I didn't know, and I said, 'Boys, what are you going to have?' And they ordered their drinks, and I paid for the three of them, and Mr. Speer asked me what he owed me, and I told him, and he settled what he owed me; and Knox came in the side door, and he said, 'Who is doing this?' and I said, 'I am, what are you going to have?' He said, 'Give me a glass of beer;' and then Burroughs came walking down from the north end of the counter where he had been sitting. He got up and walked down, and he said, 'Have you got that key of mine with you?' and I said, 'Yes,' and he said, 'Well, I want it;' and I said 'I will give it to you when I get ready.' At that he stepped back, jerked off his apron, threw it to one side, and he said, 'If that is what you came over here for, looking for trouble, you will get all you want of it;' and he stepped forward, leaned under the bar, and he said, 'Now travel, you son-of-a-bitch, travel,' and as he said that I pulled my revolver and fired at him." Defendant declared that when he fired he did so because he believed he was in danger of great personal harm at the hands of Burroughs; that he had no inten-

221 Sup—39

tion of having a difficulty with deceased, and made no demonstration toward him until he "saw him start to reach under the bar, and when he did that I thought he was going after something, and I reached with my revolver and fired." On cross-examination defendant said that he and the deceased had never had any previous difficulty, but were friends; that the only trouble between himself and deceased was that which occurred in the saloon at the time Burroughs was killed. Defendant admitted that in the court of general sessions, he had testified, in substance, that at the time deceased was reaching under the bar just before the shooting, deceased was stooping, and as he, defendant, pulled his revolver, deceased suddenly "went down, ducked out of sight behind the bar" and was out of sight, down behind the bar, when defendant reached over and fired downward, just as the deceased disappeared.

Defendant was corroborated as to the habit of deceased in carrying a pistol by both the witnesses for the State and the defense; but the evidence shows deceased had no weapon the night he was killed, either on his person or elsewhere in the saloon.

Defendant offered several witnesses who gave testimony tending to establish his good reputation for peace and quiet, both in the neighborhood of the Western Hotel, and also in the district in the vicinity of Fifteenth street and Washington avenue.

At the close of the testimony the court fully instructed the jury upon every subject connected with the commission of this offense to which the testimony had any application. We deem it unnecessary to reproduce the instructions given and those refused, but will give them such attention in the course of the opinion as their importance may require. The cause was submitted to the jury upon the testimony as indicated and the instructions of the court and they re-

turned a verdict finding the defendant guilty of murder in the second degree as charged in the information and assessed his punishment at imprisonment in the penitentiary for a term of ten years.

Timely motions for new trial and in arrest of judgment were duly filed and by the court taken up and overruled. Sentence and judgment then followed in accordance with the verdict returned and from this judgment defendant prosecuted his appeal to this court and the record is now before us for consideration.

## OPINION.

The assingment of errors as disclosed by the record now before us may thus be briefly stated:

First. That the court erroneously permitted the prosecuting attorney to cross-examine the defendant upon matters to which he made no reference in his direct examination, and upon subjects and in a manner prejudicial to defendant's rights.

Second. That the court erroneously defined in its instructions murder in the second degree and the elements thereof.

Third. That the instructions given to the jury by the court upon self-defense did not fully cover all the elements of that subject.

Fourth. That the court committed error in failing to give proper instructions upon all the law applicable to the case as made out by the evidence.

Fifth. That the court erroneously and improperly refused to give the instructions as requested by the defendant.

We will give the complaints urged by learned counsel for appellant such consideration as the importance of the propositions requires.

## I.

Directing our attention to the cross-examination of the defendant, of which counsel for appellant complains, it is sufficient to say that we have read in detail the disclosures of the record as applicable to that proposition. We find that the defendant in his examination in chief referred to his wife, and urged as a reason why he carried the pistol on the evening of the fatal difficulty that his wife had said to him that she thought there was somebody out in the back yard where the hydrant is, and that he had better go out there and see who it was, and that she advised him to take something with him for his defense, and in compliance with the suggestions by his wife he walked over to the mantel piece where there were two revolvers lying and put one in his side coat pocket and went out there. This clearly was at least a suggestion on the part of the defendant that he had this pistol at the instance of his wife and for the protection of his home against those who were improperly prowling about the premises. The cross-examination of the defendant was a mere inquiry, having referred to the fact that his wife suggested that he take something for his defense, as to whether or not he was in fact married.

We are of the opinion that the defendant having in the manner as indicated referred to his wife, there was no impropriety on the part of the prosecuting attorney in cross-examining him on a matter to which he had directly referred in his examination in chief, for the purpose of ascertaining whether in fact he was married.

It has been repeatedly and uniformly held by this court that cross-examination is not confined to a mere categorical review of the matters stated in the direct examination. It is simply a proper effort to test the truth of the evidence given in such direct examination.

[State v. Miller, 156 Mo. 1. c. 85-86; State v. Fisher, 162 Mo. 1. c. 169.]

This court, in discussing the statute which provides for the cross-examination of a defendant as to any matter referred to in his examination in chief, very properly said: "When the statute says 'a defendant may be cross-examined as to any matter referred to in his examination in chief and may be contradicted and impeached as any other witness in the case,' it does not mean that the defendant can take the stand and in answer to one or two well prepared interrogatories sweep away the whole structure of the State's case, and then remain immune from a cross-examination on the issue thus tendered. Cross-examination from time immemorial has been the great test of credibility of any witness." [State v. Miller, 190 Mo. 1. c. 463; State v. McKinzie, 102 Mo. 1. c. 632; State v. Barrington, 198 Mo. 1. c. 81; State v. Cunningham, 154 Mo 1. c. 174.]

After a most careful consideration of the disclosures of the record as applicable to this cross-examination we have reached the conclusion that it did not constitute any error which would authorize this court to reverse the judgment, and upon the contention of appellant upon this proposition the ruling must be adverse to the insistence of appellant.

II.

It is insisted by appellant in his assignment of errors that the court in its instructions to the jury improperly defined murder in the second degree. We have most carefully analyzed instruction No. 1, which defines this offense. It is as follows:

"First. Murder in the second degree is the killing of a human being willfully, premeditatedly and with malice aforethought.

" 'Willfully,' as used in these instructions, means intentionally; not by accident.

" 'Premeditatedly' means thought of before hand for any length of time, however short.

" 'Malice,' in its legal sense and as used in these instructions, does not mean mere spite, ill will, hatred or dislike as it is ordinarily understood, but it means that condition of the mind which prompts a person to intentionally take the life of another without just cause, justification or excuse.

" 'Malice aforethought' means malice with premeditation.

"The court instructs the jury, that if, bearing in mind these definitions, you believe and find from the evidence, that the defendant, Frank Myers, at the city of St. Louis and State of Missouri did on or about the 5th day of October, 1907, or at any time before the finding of the information herein, willfully, premeditatedly and with malice aforethought shoot and mortally wound, with a pistol loaded with gunpowder and leaden ball, one Garrell Burroughs and further find from the evidence, that within a year and a day after such shooting and wounding, to-wit, on or about the 5th day of October, 1907, the said Garrell Burroughs died from the effects of such shooting and wounding done by the defendant aforesaid, you will find the defendant guilty of murder in the second degree, and unless you so find the facts you will acquit him of murder in the second degree.

"If you find the defendant guilty of murder in the second degree, you will assess his punishment at imprisonment in the penitentiary for such length of time as you deem proper, not less than ten years.

"Second. The court further instructs you that if you find from the evidence that the defendant, Frank Myers, intentionally killed the deceased, Garrell Burroughs, by shooting him and wounding him with a pistol loaded as aforesaid in the manner set forth in the foregoing instructions, and that such pistol loaded as aforesaid, was a deadly weapon, then the law presumes

that such killing was murder in the second degree, in the absence of proof to the contrary, and it devolves upon the defendant to meet or repel that presumption, unless such presumption is met or repelled by the evidence introduced on behalf of the State."

We are unable to agree with learned counsel for appellant that there was any error in this instruction. It is one that has repeatedly met the approval of this court. It informed the jury that murder in the second degree is the killing of a human being wilfully, premeditatedly and with malice aforethought; then follows the definition of the terms "wilfully," "premeditatedly," "malice" and "malice aforethought" in a manner that has repeatedly met the approval of this court. There are numerous cases by this court wherein it was held that the definition of those terms as indicated was entirely proper. The definition of murder in the second degree, as embraced in the instruction, the correctness of which is challenged, finds full support in the repeated and uniform decisions of this court. [State v. Curtis, 70 Mo. l. c. 600; State v. Talbott, 73 Mo. l. c. 350; State v. Fitzgerald, 130 Mo. l. c. 420.] Those cases clearly point out the distinction between murder in the first and second degrees, and the instruction as given upon the offense of murder in the second degree is in entire harmony with the rule announced in those cases.

## III.

This leads us to the consideration of the earnest insistence on the part of appellant that the court failed in its instructions to cover all the subjects to which the testimony was applicable. This contention is principally directed to the failure of the court to give an instruction upon manslaughter in the fourth degree. The consideration of this proposition renders it essential to briefly review the testimony developed at the trial.

We have carefully read in detail all the evidence as disclosed by the record in this cause and in our opinion, giving to the testimony of the defendant, as well as to that of any other witnesses he may have introduced, full credence, it furnishes no sufficient basis for an instruction on manslaughter in the fourth degree. The defendant makes no pretense that he was laboring under any excitement or passion at the time he shot the deceased, but expressly states that he shot him in order to protect his own life. There is no evidence of any personal violence inflicted by the deceased upon the defendant before the fatal shot was fired. The defendant, in relating this occurrence, substantially stated that he met the deceased in the saloon and that he got up and walked down, and he said, "Have you got that key of mine with you?" and I said, "Yes," and he said, "Well, I want it," and I said, "I will give it to you when I get ready." "At that he stepped back, jerked off his apron, threw it to one side, and he said, 'If that is what you came over here for, looking for trouble, you will get all you want of it;' and he stepped forward, leaned under the bar, and he said, 'Now, travel, you son-of-a-bitch, travel,' and as he said that I pulled my revolver and fired at him." Defendant admitted that he had previously testified in substance that at the time the deceased was reaching under the bar just before the shooting, deceased was stooping, and as he, defendant, pulled his revolver, deceased suddenly "went down, ducked out of sight behind the bar," and was out of sight down behind the bar when defendant reached over and fired downward, just as the deceased disappeared.

We repeat, giving to the defendant's testimony its full weight, it simply makes out a case of self-defense or murder in the second degree.

In the comparatively recent case of State v. Goldsby, 215 Mo. 48, wherein the facts in some of the essential features were similar to the facts in the case

at bar, it was held that the court would not have been warranted in giving an instruction for manslaughter in the fourth degree. So it may be said in the case at bar, that the facts as developed upon the trial did not authorize the court to give an instruction upon that grade of the offense.

In State v. McKenzie, 177 Mo. 699, this court pointed out the distinction between murder in the first and murder in the second degrees and manslaughter in the fourth degree; then expressly approved the definition of manslaughter in the fourth degree as announced in State v. Hermann, 117 Mo. 637, where it was said: "Manslaughter in the fourth degree, under the statutes of this State, has often been defined by this court to be the intentional killing of a human being in a heat of passion on a reasonable provocation without malice, and without premeditation, and under circumstances that will not render the killing justifiable or excusable homicide."

In State v. Bulling, 105 Mo. l. c. 225, it was expressly ruled by this court that the heat of passion contemplated by the statute which would reduce a killing from murder in the first or second degree to manslaughter in the fourth degree "is that heat of passion which is produced by a lawful provocation as that term was understood at common law," and it was held in that case that the terms "legal," "lawful," "adequate" and "reasonable," when used as adjectives qualifying "provocation," are synonymous terms, and then announced the general rule that, with very few exceptions, it takes an assault or personal violence to constitute the provocation as contemplated by the use of those terms.

In State v. Starr, 38 Mo. 277, it was ruled by this court that, "Where there is lawful provocation, the law, out of indulgence to human frailty, will reduce the killing from the crime of murder to manslaughter; but neither words of reproach, howsoever grievous,

nor indecent provoking actions or gestures, however much calculated to excite indignation or arouse the passions, are sufficient to free the party killing from the guilt of murder. To have the effect to reduce the guilt of killing to the lower grade, the provocation must consist of personal violence. . . . There must be an assault upon the person, as where the provocation was by pulling the nose, purposely jostling the slayer aside in the highway . . . or other direct and actual battery." [See, also, State v. Branstetter, 65 Mo. 149.]

The same rule as announced in the case last cited was strictly adhered to in the comparatively recent case of State v. Gieseke, 209 Mo. 331. While the court in that case criticised an instruction given respecting the subject of manslaughter in the fourth degree, for the use of the terms "just cause," instead of "reasonable" or "lawful," yet it approved the direction to the jury that no words of abuse or vile names were sufficient to reduce the crime of killing to a lower degree than murder, and in order to reduce the crime of killing to manslaughter the provocation must have consisted of personal violence to the defendant, or the danger of such personal violence must have been apparent and imminent, or must have appeared to the defendant to be apparent and imminent at the time of the killing before they could find him guilty of manslaughter.

The testimony in this case does not indicate that the deceased had any weapon in his hand at the time he and the defendant first began the conversation about the key, but according to the defendant's own testimony the deceased simply threw off his apron and then "ducked" down beyond the bar, using the vile epithet, "You damn son-of-a-bitch," whereupon the defendant reached over the bar and fired the fatal shot, and says in his testimony expressly that he fired at him simply to preserve his own life.

In State v. Gieseke, supra, the case of State v. Grugin, 147 Mo. 39, which is chiefly relied upon by appellant in this cause, was distinguished, and it was expressly stated in the Gieseke case that "what was said in State v. Grugin, 147 Mo. 39, applied to the peculiar facts of that case, as since explained by this court, and is in no manner to be construed as overruling the long and unbroken line of authority in this State to the effect that mere words of reproach, however degrading, will not of themselves constitute such a lawful provocation as to reduce a killing from murder to manslaughter."

In State v. Gartrell, 171 Mo. 489, according to the testimony of the defendant, Gartrell, the deceased, at the time he was killed, was exhibiting a wrench and in addition thereto applied to the defendant opprobrious words and epithets. It was said in that case that "if the jury found the defendant had reasonable cause to apprehend the deceased was about to kill him, or do him great bodily harm, and the danger was about to fall, he had the right to kill him, and was guilty of no crime, not even manslaughter."

In that case State v. Garrison, 147 Mo. 548, and State v. Grugin, 147 Mo. 39, heretofore referred to, were distinguished. It was said that the facts of the Gartrell case distinguish it from State v. Garrison, in that, that in that case the threat was accompanied by the throwing of a hatchet at defendant by deceased, which constituted an actual assault. In distinguishing the Gartrell case from the case of State v. Grugin, supra, it was said: "While there is language in State v. Grugin, 147 Mo. 39, which, in the absence of an understanding of all the facts, tends to support the contention of defendant that words of opprobrium alone are sufficient provocation, it is obvious that the learned judge who wrote that opinion confined his remarks to the exceptional facts of that case. He nowhere expressed any intention of overruling the long

line of cases in this State to the contrary. He was dealing with the provocation suffered by a father over the outrage of his daughter, and the heartless and insolent confession, in effect, by the deceased, coupled with a threatened assault.'' The final conclusion then was announced in the Gartrell case that ''while doubtless there are many cases in which the facts justify not only an instruction on self-defense, but one for manslaughter in the fourth degree, we do not think this case required an instruction on any grade lower than murder in the second degree.''

In State v. Gordon, 191 Mo. l. c. 125, the rule as applicable to this subject was thus announced: ''At common law words of reproach, howsoever grievous, were not provocation sufficient to free the party killing from the guilt of murder, nor were contemptuous or insulting actions or gestures without an assault upon the person, nor was any trespassing against lands or goods to have the effect to reduce the guilt of killing to a grade of manslaughter; the provocation must consist of personal violence. [East's Pleas of the Crown, 233; 4 Blackstone, Com., 201; State v. Wieners, 66 Mo. 13.] And the common law rule in this respect is firmly established in this State by a long line of decisions. [State v. Starr, 38 Mo. 271; State v. Branstetter, 65 Mo. 149; State v. Hill, 69 Mo. 451; State v. Elliott, 98 Mo. 150; State v. Gartrell, 171 Mo. 516-519.]''

We have thus given expression to our views upon this proposition, and if the long and unbroken line of cases which announce the rule respecting the nature and character of the provocation essential to reduce the killing from murder to manslaughter is to be longer followed, we see no escape from the conclusion that this case was not one which warranted the court in giving an instruction for manslaughter in the fourth degree.

Repeating partly some of the evidence upon which it is sought to base an instruction for manslaughter,

it will be observed that the deceased was exhibiting no
weapon at the time the conversation began about the
key, and the defendant had made no demonstration
toward the deceased until he saw him start to reach
under the bar, and when he did that, presumably the
defendant must have thought he was going after some-
thing, and reached with his revolver and fired. Ac-
cording to the defendant's testimony the deceased
was "leaning" or "ducking" or "stooping," and "as
he started to reach under the counter I drew my re-
volver and he immediately seemed to duck." It ap-
pears from the testimony that the defendant and the
deceased were on opposite sides of the bar. As de-
ceased ducked defendant reached over the bar and
fired; just fired down where he thought he might be;
fired just as he disappeared. Deceased was unarmed;
had on no coat, only his bartender's jacket. Under
this state of facts, in view of the uniform expressions
of this court as to the rules of law applicable to such
state of facts, we are unable to reach any other con-
clusion than that the court's action in refusing the
instruction for manslaughter in the fourth degree was
entirely proper.

## IV.

This brings us to the consideration of the insist-
ence on the part of learned counsel for appellant that
the action of the court in refusing the instructions re-
quested by the defendant constitutes error. We shall
not undertake to reproduce the instructions requested.
It is sufficient to say upon that proposition that we
have carefully analyzed in detail the instructions re-
quested and refused. Instruction numbered 1 em-
braced an instruction for manslaughter in the fourth
degree, as well as numbered 3. That question has been
fully discussed in the consideration of the third propo-
sition. Instruction numbered 2 is a brief instruction

upon justifiable homicide, which is fully covered by the instructions given by the court. Numbers 4 and 5 are both instructions on manslaughter in the fourth degree. Number 6 is an instruction covering the subject of the weight to be attached to the testimony of witnesses. That subject is fully covered by the instructions of the court. Instructions numbered 7 and 8 are directed to the subject of justifiable homicide. As before stated the subject was fully treated of in the instructions as given by the court. Number 9 is another instruction embracing the subject of manslaughter in the fourth degree. As before stated that subject has been fully treated of in the consideration of the third proposition as stated in the opinion, hence there is no necessity for repeating what was said concerning that subject.

## V.

We have herein given expression to our views upon the legal propositions as disclosed by the record. The testimony as developed upon the trial was somewhat in conflict. It was the exclusive province of the jury to pass upon the evidence. The facts as testified to both by the witnesses for the State and the defendant presented a case either of murder in the second degree or justifiable homicide on the ground of necessary self-defense. The court submitted the issue as presented fairly to the jury; fully covered every subject to which the testimony was applicable; in fact the instructions as given presented the case in a most favorable view for the defendant. The jury was required to find every essential element necessary to constitute the offense of which the defendant was convicted, and the law upon the subject of self-defense was fully and extremely favorably declared for the defendant.

Entertaining the views as herein indicated, the judgment of the trial court should be affirmed, and it is so ordered.

All concur.