## THE STATE v. MINOR, Appellant.

### In Banc, February 26, 1906.

1. **INFORMATION: "Upon His Oath," etc.** An information charging murder in the first degree, which in its concluding clause omits to say that it is based upon oath, is insufficient. In this case the conclusion was, "And so the said A. W. Lafferty, prosecuting attorney aforesaid, does say," etc., omitting to say that it was "upon his oath." *Held*, not sufficient to sustain a verdict of murder in the second degree.

2. ———: ———: **Particularity.** It has been the uniform rule of this court to require an indictment charging murder to conclude "upon the oath" of the grand jurors. And when an information is used to charge murder it rises to equal solemnity with an indictment, and there is no reason why an equally strict requirement as to the words used should not be enforced.

3. ———: ———: **At Common Law: Kyle Case.** The fact that an information at common law was not required to conclude "upon the oath" of the Attorney-General, is no reason why the information which our Constitution now permits to be used for charging murder should not conclude with the words "upon his oath," for the common-law information was not used to charge murder. And this court in saying, in State v. Kyle, 166 Mo. 303, that the information referred to in the amendment to the Constitution making an indictment and information concurrent remedies, was the common-law information, had reference to the source of the information, and not to its constituent elements.

4. **MURDER: In First Degree: Deadly Weapon: Presumption.** A presumption of murder in the second degree arises from the killing of deceased with a deadly weapon, if done intentionally, unless otherwise explained; but if there is no evidence of deliberation or lying in wait or of any of the other elements which distinguish murder in the first degree, the question of first-degree murder should not be submitted to the jury. And the facts that defendant ran away, denied his name and fainted when charged with the crime, do not tend to establish deliberation.

5. ——: **In Second Degree: Intentional: Presumption.** An instruction which authorizes the jury to find the defendant guilty of murder in the second degree without finding that the killing was intentional, is error. No presumption of murder in the second degree arises from the killing of deceased with a deadly weapon unless the killing was intentional. [Distinguishing State v. McKinzie, 102 Mo. 620, and State v. Evans, 124 Mo. 397, and holding that the latter case does not overrule the former.]

6. **PRACTICE: Incompetent Evidence: Exclusion of Jury: Witness Questioned by Defendant.** Where both parties anticipate that a witness will make a statement as a part of the dying declaration of deceased that is incompetent, and the jury has been excluded, and defendant's counsel then request that the prosecuting attorney ask the question which he intends to ask in the presence of the jury, in order that the court may properly understand just what part of the statement is incompetent, and the prosecuting attorney declines to ask the questions in the absence of the jury, the court should permit the defendant's counsel to do so.

Appeal from Montgomery Circuit Court.—*Hon. H. W. Johnson*, Judge.

REVERSED AND REMANDED.

*Claude R. Ball, Emil P. Rosenberger* and *James F. Ball* for appellant.

(1) Instruction 5, given on behalf of the State, completely ignores the element of intent or willfulness. Had the instruction read "that the defendant intentionally shot William Green with a pistol," etc., then it would not be subject to criticism, but would state the

rule of law correctly. State v. Harris, 76 Mo. 361; State v. McKinzie, 102 Mo. 620. In a later case, State v. Evans, 124 Mo. 411, the court attempted to disapprove of the ruling in the McKinzie case, but the State v. Evans was not well considered. We concede the correctness of the instruction we are criticising excepting the omission of the word, "intentional." The omission of the word "intentional" renders this instruction wholly erroneous. (2) Over defendant's objections witness Smith was permitted to relate the conversations he had with deceased before his death in which deceased stated that the defendant shot him for the purpose of robbing him or over the affections of a woman, the witness not being clear on these points. It has been expressly held in this State in State v. Welsor, 117 Mo. 571, that statements contained in a dying declaration as to the motive for the homicide should be excluded on proper objection. The admission of this testimony poisoned the jury against defendant and permitted it to render the verdict it did. Exclude these supposed dying declarations and the State has absolutely failed to make a case. (3) When witness Smith was attempting to narrate the dying declarations of deceased, the court on defendant's motion should have excluded the jury for the purpose of ascertaining if the declarations were admissible, and if so, how far; and we called the court's attention to the prejudice worked against defendant in the court's refusal so to do. Before the court could close the mouth of witness Smith, who was more than willing to tell what he knew, he blurted out, "He said he killed him for his money." As an antidote for this poison, the court, in instruction 14, given on behalf of the State, attempted to withdraw this statement from the jury, but the poison was before the jury and it was impossible to withdraw it by any instruction. (4) Aside from all of the other questions we have raised, under the recent rulings of this court on account of the information failing to conclude, this case must

be reversed and remanded. The information in this case concludes as follows: "And so the said A. W. Lafferty, prosecuting attorney, aforesaid, does say," etc. State v. Coleman, 186 Mo. 151; State v. Atchley, 186 Mo. 174; State v. Dawson, 178 Mo. 60.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) Instructions 4, 5, and 6, given on behalf of the State, correctly define murder in the second degree. They are almost literal copies of instructions that were approved by this court. State v. Evans, 124 Mo. 397. (2) The witness Smith told more of Green's statement than was competent, to-wit, the motive for the crime. Upon objection by the defendant, the prosecuting attorney consented that that part of his statement, to-wit, "He shot me for my money," might be stricken out as incompetent. The same was stricken out by instruction 14, given on behalf of the State. This was sufficient to correct this error. State v. Welsor, 117 Mo. 570; State v. McGinnis, 158 Mo. 105; State v. Fredericks, 85 Mo. 150. But this entire declaration of the deceased was admissible as a part of the *res gestae.* State v. Hudspeth, 159 Mo. 178. (3) Appellant still complains of the testimony of witness Smith. But this testimony was not objectionable until brought out by defendant, after the prosecuting attorney had consented that the objectionable part be stricken out. In cross-examination, the defendant's attorney waived this error, if error it was, by asking this witness to "commence and state it all over again, all that Bill Green told you there the time you went in until he died." The witness, at defendant's request, related it again, the competent as well as the parts that were objected to. Defendant cannot, therefore, complain of this evidence. (4) Appellant contends that the information is defective because in the concluding allegation it is not alleged that the

charge is made by the prosecuting attorney "upon his oath." The information is verified on the information and belief of the prosecuting attorney, in accordance with the provisions of section 2477, Revised Statutes 1899. Notwithstanding the decision of the court in Banc in the cases of State v. Coleman, State v. Dawson, and State v. Atchley, decided at the October term, 1904, of this court, respondent asks the court to again review the authorities bearing upon the question and to consider carefully arguments which, it is respectfully submitted, demonstrate the error in the decisions referred to. The decision in the case of State v. Coleman, to the effect that the concluding allegation of an information must be upon the oath of the prosecutor, finds its support in the fact that the concluding clause of an indictment must be upon the oath of the grand jurors. The same rule that makes it necessary that an indictment should conclude upon the oath of the grand jurors requires that an information should not conclude upon the oath of the prosecuting attorney. In addition to this, the decision in the Coleman case and the reasoning upon which it is based will inevitably lead to irreconcilable contradictions and confusion in our criminal procedure. The reason why under our practice an indictment must be upon the oath of the grand jurors is because the indictment of the common law is the indictment which is referred to and provided for by our Constitution. It was necessary, according to the precedents of the common law, that an indictment should conclude with the charge of murder, and that the same should be made upon the oath of the grand jurors. 1 Horton's Precedents on Indictments and Pleas, 114; 5 Chitty's Criminal Law, 738; 2 Bishop's Criminal Procedure, 536, 548, 550; State v. Meyers, 99 Mo. 107; State v. Stacey, 103 Mo. 11; State v. Ferguson, 152 Mo. 92. By the same test that the conclusion of an indictment should be upon the oath of the grand jurors, the conclusion of an information should not be upon the

oath of the prosecutor. For an information at common law was not a statement by the Attorney-General, the Solicitor-General, or the master of the crown office upon oath, but a mere presentment to the court. 2 Hawkins Pleas of the Crown, 369, 370; 5 Bacon's Abridgment, 169, 170; Heard's Criminal Pleading, 31; Regina v. Steele, 2 Q. B. 40; 4 Blackstone's Commentaries, 310; Rex v. Wilkes, 4 Burrows 2687. The question is not as to the allegation of the "material parts of the crime," but as to whether those material parts must be made upon the oath of the prosecuting attorney, or upon "only the allegation" of that officer. 4 Blackstone's Commentaries, 310. It has been frequently decided in this State that the information provided for by our Constitution is the information of the common law. State v. Kyle, 166 Mo. 303; Ex parte Slater, 72 Mo. 102; State v. Kelm, 79 Mo. 515. And the power that is possessed by the Attorney-General, the Solicitor-General in the absence of the Attorney-General, and the master of the crown office, is now possessed by the attorneys-general and prosecuting attorneys under our judicial system. Bishop's New Criminal Procedure, (4 Ed.), 144; State v. Kyle, supra. While at common law, any felony punishable by capital punishment could not be prosecuted by misdemeanor but by indictment only (4 Blackstone's Commentaries, 310), yet, when the people of Missouri, by constitutional amendment adopted in 1900, provided for the prosecution of all felonies and misdemeanors by indictment or information they intended that all criminal offenses could be prosecuted by indictment or information, according to the forms and precedents of the common law. State v. Kyle, supra; State v. Kelm, supra; State v. Ransberger, 106 Mo. 145. It cannot be successfully contended that the people of this State, in providing that felonies and misdemeanors could be prosecuted by information, meant an information different from that which had been known to our jurisprudence from the time of the

year books. It must be taken as settled, therefore, that the information provided for by our Constitution is the information of the common law. Rex v. John Horne, 4 Harg. St. Tr. 264. From these authorities it is readily apparent that the Attorney-General made presentment against one who had violated the law, not upon his oath, but simply as an allegation of fact presented to the court in his official capacity. The Attorney-General, or other officer authorized to file informations, was not required to say that his presentment was made upon his official oath, or upon his oath. When he proceeded by information, it was "the king's suit" that he brought, as it is now the State's suit that is instituted by the prosecuting attorney when he files an information. State v. Schnettler, 181 Mo. 186.

VALLIANT, J.—Defendant was arraigned on an information designed to charge murder in the first degree. The trial resulted in a conviction of murder in the second degree and a sentence of twelve years in the penitentiary. From that judgment this appeal comes.

I. The main question in the case arises upon the face of the information which was presented by the prosecuting attorney of the county in which the homicide occurred. The information follows closely the usual form of an indictment for murder in the first degree in its words descriptive of the acts constituting the alleged crime, charging that the assault, the discharge of the weapon and the inflicting of the deadly wound, each, was done willfully, deliberately, premeditatedly, feloniously and of the defendant's malice aforethought. Then it concludes as follows: "And so the said A. W. Lafferty, prosecuting attorney aforesaid, does say: that the said Joseph Minor, him the said William Green, then and there in the manner and form and by the means aforesaid, at the county aforesaid, on the day aforesaid, feloniously, willfully, deliberately, premed-

itatedly, and of his malice aforethought did kill and murder; against the peace and dignity of the State.''

The only ground on which the sufficiency of this information is challenged is that the words, ''upon his oath,'' are not included in the concluding clause, that is, it does not say that the ''prosecuting attorney aforesaid *upon his oath* does say,'' etc.

This precise point has been very recently considered by this court in the case of State v. Coleman, 186 Mo. 151, wherein, in an opinion by BURGESS, J., reviewing the former decisions of this court, it was expressly held that the words, ''upon his oath,'' in the connection above mentioned, were essential in an information charging murder, and because of their absence the information then under consideration was held to be not sufficient, although the concluding clause there, as here, charged that the defendant willfully, deliberately premeditatedly, feloniously and of his malice aforethought did kill and murder the deceased.

The decision in that case has since been followed and approved in State v. Atchley, 186 Mo. 174, and State v. Dawson, 187 Mo. 60.

In the case at bar the Attorney-General has asked us to reconsider the subject and has fortified his request with such an earnest and learned argument that we have deferred to his request and have gone carefully over the matter again with the aid of the additional light that the learned law officer has given us, but we have found no sufficient reason for recalling what we said in the Coleman case.

In State v. Meyers, 99 Mo. 107, an indictment in all respects otherwise sufficient to constitute a charge of murder, was held insufficient because in the concluding clause it was not said that the grand jurors *upon their oath* so charged. The indictment in that case in the beginning said: ''The grand jurors aforesaid upon their oaths aforesaid present,'' etc., but the words, ''upon their oath,'' were not repeated in the concluding

clause. For the omission of those words the indictment was held insufficient. That decision was approved and followed in State v. Stacy, 103 Mo. 11; and State v. Furgerson, 152 Mo. 92.

The Attorney-General concedes that the words in question are essential in the concluding clause of an indictment for murder, because such was the form of such an indictment at common law, but that for the same reason those words are not necessary in an information, that is, because such was not the form of an information at common law. It is true those words were not used in an information at common law, and in this connection the Attorney-General refers us to our decision in State v. Kyle, 166 Mo. 303, wherein it was said that the information referred to in our Constitution was the common-law information. The reference in that case to the common law for an understanding of the term "information," as distinguished from an indictment, was for the purpose of pointing out the difference in the source of an information from that of an indictment, the latter coming from a grand jury, whereas an information was "a criminal charge which at common law was presented by the Attorney-General or, if that office is vacant, by the Solicitor-General of England," etc. The same distinction there pointed out between an indictment and an information still exists in this State, notwithstanding the amendment to our Constitution, that is, the one emanates from a grand jury, the other from the Attorney-General or the prosecuting attorney of the county in which the crime was committed. That is all that was said on that point in the Kyle case.

By force of the recent amendment of our Constitution an information has in one important respect at least been placed upon equality with an indictment, that is, it is confined no longer, as it formerly was, to the presentation of minor offences, but is authorized to be

used to bring an accused person to trial on a charge of the highest felony known to the law.

There was no other legal document at common law in which there was such particularity as to the words and form of expression required as in an indictment for murder.

And that great particularity was required, not because of the source from which the indictment emanated, but because of the high grade of crime which it charged—because life and liberty were at stake. An information at common law emanated from the Attorney-General who was pre-eminently learned in the law and in the knowledge and meaning of words and was skilled in the art of arranging his language in a form to express most clearly his meaning. Therefore the fact that an information came from the Attorney-General furnished no reason for indulging in less technical particularity of words to charge a crime in an information than in an indictment; the reason for the difference was that the offense charged in an information was not of such serious consequence. But under the recent amendment to our Constitution an information may be used to charge the crime of murder and when so used it rises to equal solemnity with an indictment and there is no reason why we should be less strict in the require-ment of apt words to distinguish the different degrees of crime in homicide in the one than in the other.

We find no precedent in a common-law information charging the crime of murder, therefore, the form and precedents of informations and their set phraseology are of no use to us in this inquiry. When we seek to know in what words and form a charge of murder must be stated, the only precedents we have are those contained in common-law indictments.

The words which this court in former decisions has adjudged to be essential to distinguish murder from manslaughter are but literal translations of the words used for that purpose in indictments at so early a

period that the court records in England were written in Latin. Those words by their long use have acquired certain fixed meanings which are now so well understood that any departure from them would be unsafe. The set phraseology has sometimes been criticised as for its repetition and surplusage, but when we consider the gravity of the offense and the dignified solemnity of the words employed, not only to specify the crime so that the accused may know to what he must answer, but also calculated as it is to impress on the mind of the accuser the solemnity of the charge he is laying against the accused, we can find no just fault with the approved form and no reason for not requiring the accuser to use words calculated to remind him that what he is about to say must be said in memory of his solemn oath.

Charging the crime in the information on the oath of the prosecuting attorney does not mean that the prosecuting attorney is speaking of his own knowledge any more than do the grand jurors when they on their oath charge the crime in an indictment, but it means with the prosecuting attorney what it means with the grand jury; that is, that he has diligently inquired and faithfully considered the evidence that has come to him and as the result of his investigation is so satisfied of the truth of the charge that he is willing to say on his oath, in the same sense that the grand jurors say on their oath, that the accused committed the crime specified.

The grand jurors make their presentment on what they regard as trustworthy evidence and the prosecuting attorney acts on what he regards as trustworthy evidence and the official oath in each case is designed to show that the official preferring the charge is mindful of the oath he has taken.

We adhere to our decision in State v. Coleman, 186 Mo. 151, and must therefore hold that the information in this case is not sufficient to sustain a conviction for

murder in the second degree and for that reason the judgment will be reversed.

Since the cause is to be remanded for a new trial there are some other points in the record that deserve consideration.

II. The evidence for the State tended to show as follows:

Defendant and the deceased were of a gang of men, all negroes, employed as laborers in a railroad construction camp in Montgomery county. There was a large tent in which the men slept, arranged with bunks on each side and an aisle in the middle; not far from it was a mess tent where the men ate. On the evening of December 7, 1903, between six and seven o'clock, while the men were at supper in the mess tent, a pistol shot was heard in the direction of the sleeping tent, whereupon one of the men, James Smith, left the table and went immediately to the sleeping tent and there found the deceased lying in his bunk holloing, "I am shot." No one else was in the tent when Smith got there, but he heard some one running away. Smith testified that deceased said, "I am dying, I am shot through the heart. Joe Minor did it." Witness remained with deceased until he died, which was about an hour after the shooting. The defendant was not seen about the camp after that, but was arrested in St. Louis the next day; when arrested he denied that his name was Minor, said his name was Thomas, but when he was confronted by a sister of deceased who accused him of killing her brother he fainted. After he was arrested he told the officer that he shot the deceased, but that it was an accident, that he ran away because he was scared.

The defendant in his own behalf testified that he was twenty-five or twenty-six years old, was born and reared on a plantation in Alabama, that he had been hired as a laborer in this camp, and that on the evening in question he was seated in the bunk opposite the one

on which the deceased was, and that a man who was called Mickey was present with a pistol; defendant asked to look at the pistol and whilst examining it, it went off accidentally and shot the deceased; that when he saw what had happened, he got scared and ran away and went to St. Louis. Mickey and one or two others who were present also ran away.

There was no evidence of any ill will or other motive for the homicide. The record does not show what became of Mickey and the others who ran away. There was no eyewitness to the act who testified except the defendant himself.

The court instructed the jury that they should find the defendant guilty of murder in the first degree, or murder in the second degree, or manslaughter in the fourth degree, or they should acquit him.

III. The court erred in submitting to the jury the question of murder in the first degree; there was nothing in the evidence that would have justified a conviction of murder in the first degree.

The utmost which the State's evidence tended to prove was that the defendant killed the deceased with a deadly weapon, from which act, if done intentionally, until otherwise explained, a presumption of murder in the second degree arises. There was no evidence of deliberation or of lying in wait or of any of the other facts mentioned in section 1815, Revised Statutes 1899, which distinguish murder in the first degree. The facts that the man ran away, denied his name and fainted when charged with the crime, all may go as evidence for what they are worth tending to prove that the killing was criminal, but do not tend to prove deliberation or any of the essential facts specified in the statute defining murder in the first degree.

IV. The court at its own instance gave among others the following instructions:

193 Sup—39

"4. If you believe and find from the evidence in this cause that the defendant, at the county of Montgomery and State of Missouri, on or about the seventh day of December, 1903, willfully, premeditatedly, and of his malice aforethought, but without deliberation, shot with a pistol, and by such shooting killed William Green, then you will find him guilty of murder in the second degree.

"5. If the jury believe and find from the evidence in the case that the defendant shot with a pistol, and by such shooting killed William Green, the law presumes that such killing was murder in the second degree, in the absence of proof to the contrary, and in such case the burden of proof devolves upon the defendant to show to the reasonable satisfaction of the jury, from the evidence in the case, that he is guilty of a less crime than murder in the second degree, or that the homicide was excusable."

Of those two instructions number 4 correctly stated the law, but number 5 did not, and, taking them together, number 5 was an unwarranted qualification of number 4, since it authorized the jury to convict the defendant of murder in the second degree without finding that the killing was intentional which was the one disputed fact in the case.

Intention to commit a crime, like intention to commit a fraud, need not be proven by direct evidence but may be inferred from the circumstances, provided the circumstances are such as that such inference may fairly be drawn, and provided the triers of the fact draw such inference. But it is for the triers of the fact to draw such inference and not the court to do so. If the court is of the opinion that the circumstances are such as that such an inference may be fairly drawn, it may submit the question to the jury, but there its control of the point, for the time being, ends.

A man is ordinarily presumed to have intended to do that which he has done and that presumption may

have its influence in weighing the evidence, but, after all, the intention is a fact to be found from the circumstances.

In State v. McKinzie, 102 Mo. 620, among other instructions given was the following:

"5. The jury are instructed that from the simple act of killing with a deadly weapon the law presumes it to be murder in the second degree. If the defendants killed Emery by stabbing him with a knife then the law presumes the defendants guilty of murder in the second degree in the absence of proof to the contrary."

Commenting on that instruction this court, in an opinion by THOMAS, J., said: "We may concede that apparently some expressions used in the earlier opinions of this court would seem to justify the giving of instruction numbered 5." Then after quoting from one of the earlier cases on that point, the court said: "So we take it that even the earlier cases do not teach the doctrine contained in instruction numbered 5. But be that as it may, we feel satisfied that all the cases, from the State v. Wieners, 66 Mo. 13, decided in 1877, to this time, hold that 'from the simple act of killing with a deadly weapon' no presumption of law arises that the killing is murder in the second degree." And so the court held that because the word "intentional" was omitted in that instruction before the word "killing," it was error.

It is argued that that decision was overruled in State v. Evans, 124 Mo. 397. In the Evans case the court was dealing with an instruction in these words: "If you find from the evidence that the defendant intentionally killed Peter Fine by shooting him with a loaded pistol and that such pistol was a deadly weapon, then the law presumes that such killing was murder in the second degree, in the absence of proof to the contrary; and it devolves upon the defendant to adduce

evidence to meet or repel that presumption, unless it is met or repelled by the evidence introduced by the State."

The court approved that instruction saying that similar instructions had long received the sanction of this court, and that it was also the rule at common law, then the court said: "We have been cited to a ruling *contra* this (State v. McKinzie, 102 Mo. 620), but we disapprove of that ruling." In point of fact, however, the ruling in the McKinzie case was not *contra* to the ruling in the Evans case. The instruction approved in the Evans case contained the very word for the omission of which the otherwise similar instruction in the McKinzie case was disapproved.

In the Evans case the instruction was, "If you find from the evidence that the defendant intentionally killed Peter Fine by shooting him with a loaded pistol," etc.

What was said in the McKinzie case was not in conflict with anything that was said in the Evans case and is therefore not overruled or disapproved.

We hold, therefore, that from the intentional use of a deadly weapon which results in a homicide a presumption of murder in the second degree may be drawn, unless the evidence satisfactorily shows a different degree of crime or excusable homicide, and although the intention need not be proved by direct evidence, but may be inferred from the circumstances if the circumstances justify the inference, and if the jury from such circumstances draw such inference, yet unless the triers of the fact are satisfied that the defendant intentionally used the deadly weapon they cannot, from its bare use, presume murder. Under the evidence in this case the court was justified in submitting that question to the jury and if the instruction numbered 5 had contained the word "intentionally" or its equivalent before the words "shot with a pistol," it would have been correct, but in the absence of the word

"intentionally," or its equivalent, the instruction was erroneous.

V. The witness Smith who undertook to give the dying declarations of the deceased testified that the deceased said that the defendant shot him for the purpose of getting his money, but did not get it, because it was in his hip pocket. On objection of defendant, and with the consent of the prosecuting attorney, the court ruled that the statement, being only the expression of the opinion of deceased as to the motive for the killing, was incompetent and should be stricken out, and the court gave an instruction withdrawing it from the consideration of the jury.

Counsel on both sides agreed that the testimony was illegal, yet we gather from the record that they anticipated that this witness, if asked to state what the deceased said, would make the objectionable statement above mentioned. To guard against this, when this witness was on the stand and was about to be questioned on this point by the prosecuting attorney, the counsel for defendant asked that the jury be excluded, which was done, and then they requested that the prosecuting attorney be required to propound the questions he purposed to ask the witness on this point in the presence of the court so that the court could decide how much of the supposed dying declaration was competent and how much was incompetent, and instruct the witness accordingly. But the prosecuting attorney declined to ask the questions in the absence of the jury and the counsel for defendant complained that they were not allowed to do so, and so the jury were brought back, and the witness being asked by the prosecuting attorney to state what the dying man said, made the objectionable statement above mentioned, which, after the jury had heard it, was conceded by the prosecuting attorney to be incompetent and was ordered by the court to be stricken out.

When illegal testimony of an injurious character has once been heard by the jury, the only remedy the

court can, at that stage of the case, apply is that which it did in this instance apply, but that does not always undo the wrong and it does not exhaust the court's power to thereafter do what is necessary to correct the wrong. What consideration should be given to such a fact on a motion for a new trial is a question in the first place for the trial judge and depends greatly on the nature of the illegal evidence and the circumstances of the given case. If the wining party was really not responsible for the bringing out of the illegal evidence, the court would be much less inclined to grant a new trial on that ground than it would if it was satisfied that the winning party had contrived to bring it out.

In this case the man's life and liberty were at stake, therefore the greatest care should have been taken by the court and counsel, as well the counsel for the State as for the accused, to prevent the introduction of illegal evidence which when once lodged in the minds of the jury no one can tell its effect.

If the prosecuting attorney did not see fit to question the witness in the absence of the jury for the information of the court, the counsel for the defendant should have been allowed to do so, so that the court could have admonished the witness not to make the objectionable statement. On a retrial the court will have no difficulty in guarding against the introduction of that illegal evidence.

The judgment is reversed and the cause is remanded to the circuit court to be retried according to the law as herein expressed, allowing the prosecuting attorney leave to amend the information if he sees fit to do so.

All concur, except *Marshall, J.,* not sitting.