THE STATE v. ANNA EASON, Alias ROWE, Appellant.—18 S. W. (2d) 71.

Division Two, June 4, 1929.

*Stratton Shartel*, Attorney-General, and *Don Purteet*, Assistant Attorney-General, for respondent.

COOLEY, C.—By an indictment returned in the Circuit Court
of the City of St. Louis appellant was charged with murder in the
second degree for the killing of her husband, James R. Eason, alias
James Rowe. On a trial at the December, 1927, term of the court
she was convicted of murder in the second degree and after her mo-
tion for new trial was overruled she was duly sentenced to ten years'
imprisonment in the penitentiary, in accordance with the verdict,
and she appealed.

At the time of deceased's death he and defendant had been mar-
ried about six years. His name was Eason, but he also went by the
name of Rowe, a number of witnesses, including several of defend-

ant's, testifying that they knew the couple only by the name of Rowe, which fact probably accounts for that name being mentioned as an alias in the indictment. Defendant, however, claimed that while her husband used that name she herself never did. Defendant had been married to a man named Dietrich prior to her marriage to Eason, and by the first marriage had a daughter, Clara, aged about thirteen years at the time of the trial, and a son aged nine.

Defendant and deceased, practically from the time of their marriage, led a rather turbulent life together, due to his habits and temper. The record abounds with evidence introduced by defendant that he was addicted to the intemperate use of intoxicating liquor, getting drunk very frequently, and on such occasions being quarrelsome and abusive toward defendant, often striking and beating her and at times threatening her life; that he would not work regularly, his reputation in this respect, as well as for drunkenness, being notoriously bad. While it seems that defendant would have something to say in their quarrels and sometimes she may have fought back as best she could when he assaulted her, the evidence does not warrant the inference that she was at fault in these domestic troubles.

Deceased was killed about midnight of February 12, 1927. Other than defendant and her daughter Clara, no witnesses testified who were present at the time. In response to a call from some one, a police officer, Henry Baldwin, went to the intersection of 7th Street and Park Avenue, where he found deceased, who was then either dead or dying. He did not speak and the officer could detect no pulse. Shortly afterwards other police officers arrived. Deceased was found lying on the curb, with his feet in the gutter, at the northwest corner of the street intersection. There was a small group of people present, Baldwin says about ten, when he arrived. Defendant was there, but apparently her daughter Clara was not then present. Defendant was stooping over deceased, nervous and excited and crying "hysterically like," and saying: "Jim, Jim, please speak to me." Asked by Baldwin what had happened she said: "I don't know." He then asked her: "What is this man to you?" To which she replied: "Nothing." Then, while Baldwin was feeling for the man's pulse, defendant started to walk away and Baldwin called her back and again asked what had happened to the man and she again said: "I don't know." By this time other officers had arrived and defendant was taken to the police station.

The body of deceased was taken to a hospital and thence to the morgue. An autopsy was held from which it appears that death was caused by hemorrhage resulting from a stab wound in the right side of the chest between the fourth and fifth ribs, near the breast bone, and penetrating the lung. There was but the one wound.

At or very near the spot where the body was found, one of the officers found and picked up a pocket knife with open blade which had "wet" blood, that is, fresh blood, upon it. Defendant's evidence tends to show that this pocket knife belonged to deceased. In a vacant lot on the north side of Park Avenue, some thirty feet from the sidewalk and about half a block west of the spot where the body was found, there was also found, about two and a half hours later, a knife which is referred to in the evidence as a butcher knife. It was found by an officer after defendant had made the admissions and confession hereinafter referred to, and at the place where the officers testified defendant had told them she had thrown it. When found it had some dark colored stains on the blade that might have been blood stains, but were then dry, and it was not shown whether they were in fact blood stains or not. Blood drops were found at intervals *eastward* from where the body was found, across 7th Street, and thence east for some fifty or sixty feet on the sidewalk on the north side of Park Avenue, but there is no evidence to explain them, since the butcher knife was found west of the point where the body was found and there is no evidence that the fatal encounter occurred east of that point. There were no blood stains upon defendant's hands or clothing. The two knives above referred to were introduced in evidence. The evidence shows that the fatal wound could have been inflicted by either.

At the police station defendant was questioned for a considerable time by the officers who had her in custody. On the way to the station and for some time after arriving there, she persisted in her denial of any knowledge of how or by whom deceased had been hurt. At length a colored man, one Richard Holliday, who seems to have witnessed the tragedy but who had disappeared before the trial and therefore was not a witness, was brought to the station and in defendant's presence said: "That's the woman I saw strike this man." To which, according to the officer's testimony, defendant merely replied: "I don't know." This officer, Mackin, testified that thereupon the following transpired: "I produced the knife and said, 'There's the knife you cut your husband with.' She said: 'It isn't. That's my husband's knife.' I said: 'What did you cut him with? She said: 'The butcher knife.' I said: 'That's a good girl. Tell me some more. Where did you put that butcher knife? What did you do with it?' She said: 'I threw it in the lot back of the garage.'" Mackin testified that he then sent two officers in a car who found the knife where defendant said she had thrown it. This conversation was testified to without objection. Defendant then, according to the testimony of the officers, told them the whole story, which was reduced to writing and signed by her and which confession was introduced in evidence. As this confession plays an

important part in the case and its admission is challenged by defendant as error, we set it out in full. It is as follows:

"My name is Mrs. Anna Eason, and I make the following statement of my own free will, without being threatened or intimidated in any manner, and knowing that same will be used against me at my trial.

"I am 30 years old, was born in Germany, am married, Housewife, and I reside at 1022a Rutger Street, with my husband James R. Eason. About two weeks ago my husband cashed a Government check for $65 and left my home and was gone for about two weeks. He returned home about February the 5th, 1927, and I asked him where he had been and what he did with the money he got from the check. We continued arguing every day up until the time I left my home this P. M. I think about 6:30 o'clock P. M. and I went in search of my husband. After walking as far as the Free Bridge I returned home, where I found my husband. We continued to argue, when I stated to my husband, 'If you leave me it will not be good for you.' About 7:30 o'clock this P. M. my husband left the house. Shortly after I took the butcher knife which was in the kitchen of my home, and I went out looking for my husband. I had no intentions to hurt him, only wanted to frighten him, so he would return home. He threatened my life on several occasions. I met him at an Oil Filling Station located at the northwest corner of 7th and Park Avenue conducted by John Gahn, known as the Belmont Garage. At the time my husband was arguing with a colored man, I do not know his name, over the price of three gallons of gasoline which he had purchased. I then told him, 'Why don't you pay the man for the gasoline,' to which he said, 'Mind your damn business.' I then struck at him with a butcher knife which I had had in my right hand, saying at the same time, 'I am going to give you what you said you were going to give me.' After cutting my husband I walked west on Park Avenue to an alley, where I threw the knife in a vacant lot located in the rear of the garage. I then returned to the corner of 7th and Park Avenue, where I found my husband lying in the gutter at the northwest corner of the above intersection. I then ran into the garage and telephoned for a City Ambulance and I cannot remember what took place after that.

(signed) ANNA EASON

"Witnesses
Sergt. Jas. M. Mackin
Prob. Pat. J. W. Doyle
Pat. Henry Baldwin."

Defendant testified in her own behalf. She testified at some length relative to the drunken habits of her husband, his aversion to work, requiring her to look to her father and mother and her own labor

for support, his quarrelsome and abusive treatment of her, and that on several occasions which she told about he had assaulted and beaten her, and had threatened her life. She also testified that a few days before the night on which he met his death her daughter Clara had informed her that her husband had compelled Clara to submit to sexual intercourse with him. Coming down to the events of February 12, 1927, she testified that her husband was drinking heavily that day and was quarrelsome and abusive; that on that evening she, with her daughter and sister-in-law, went to the market to buy provisions, finding her husband at home on her return; that he was drunk and there was some quarreling between them, in the course of which she asked him if he had attacked her daughter, and he cursed her and, thereafter, about 10:30 or eleven P. M., left; that about eleven P. M., she and Clara went out to look for him, fearing that in his drunken condition he might get into some trouble, and failing to find him, were returning, and stopped in at her mother's house; that there she took the knife referred to in the evidence as the butcher knife, which was her mother's, and put it up her sleeve. Asked by her counsel why she took the knife, she answered: "Well, for protection from the Cuckoos, or the bad neighborhood around there. It was a little late at night. And also he threatened my life often; he would kill me; so I took the knife along in case anything does attack me." But she said she did not intend to hurt anybody. She proceeded to state that when she and Clara got to the Belmont garage, at the corner of 7th and Park, she saw her husband and Holliday arguing about a gasoline bill; that she went for one Gahn, proprietor of the garage, who came back with her but left shortly after telling her husband that he was drunk and, to go home and go to bed and wait until he sobered up, and that Holliday also left; that then Jim asked her why she went for Gahn: "Is it any of your damn business?" To which she replied in the negative and asked him to come on home and go to bed and sober up; that he was drunk. She then testified thus: "I said: 'You are fighting with me.' I said: 'Did you attack my daughter?' So he said then, 'You say that again and I will kill you.' So he pulled out his knife and he come for me and I grabbed his hands and we fought, we scuffled and that is all I remember." She testified that she was nervous and hysterical and did not know what became of the butcher knife; that it might have dropped out of her sleeve; that when he came at her with the pocket knife she thought he was going to kill her; that she thought he fell when the scuffle ended.

She testified further that she was questioned several hours by the officers; told them she knew nothing about it; didn't know how it happened, and that during the questioning she was crying and hysterical and that finally she signed a paper that the officers told

her was a bond and that they told her Jim was all right, that it was only a slight cut and that if she would sign the bond they would let her go home; but that she did not read it, was too nervous and excited to read anything and wanted to get home and that it was not read to her; that she did not know she was signing a confession, but thought it was a bond. She denied making the verbal admissions attributed to her by Mackin and the other officers, and denied making, verbally or otherwise, the incriminating statements contained in the written confession. She admitted that the signature to the confession was her signature.

On cross-examination she marked on a plat the spot near the gasoline pump where she said the scuffle occurred, which was a little distance from where the body was found, but just how far is not shown. She did not testify to any abuse offered or threats or promises made to her to induce her to sign the paper she signed, other than as above stated. She denied stabbing her husband, or that she threw the butcher knife in the vacant lot where it was found, or that she so told the officers. She also testified that when the officer brought her back after she started to leave the scene of the trouble, her husband was sitting on the curbstone. The officer had testified that the man was lying there apparently dead. She was cross-examined at considerable length, but did not deviate substantially from the story told in her testimony in chief.

Defendant's daughter Clara testified that she was with her mother and corroborated defendant's testimony substantially up to the time the "scuffle" ended and Eason fell, when she said she left and ran across the street to her uncle's house and remained there, so was not present when the officers came. She also testified that deceased had twice, not long before, compelled her to submit to sexual intercourse with him, and had tried several times before that, and that she had told her mother about this four or five days before the killing; had not told her mother sooner because defendant had threatened to kill her if she did. The officers present when defendant was questioned denied that defendant was told that the paper she was signing was a bond or that any threats or promises were made or mistreatment of any kind offered her or inducements held out to her, and swore that she was perfectly rational all the time, though nervous and somewhat excited, especially at first; that the confession was read to her and that she took it and read it herself before signing. Further pertinent facts, if necessary, will be given in the course of the opinion.

Defendant was represented at the trial by counsel employed by her, but is not represented and has filed no brief in this court. We are left, therefore, to ascertain from her motion for new trial the grounds upon which she seeks reversal of the judgment and to determine from examination of the record whether or not error appears therein.

I. The indictment was in the usual and approved form and sufficiently charges murder in the second degree. The only complaint made of it was by motion to quash and plea in abatement on the ground that by referring to defendant therein as "alias Anna Rowe," an alias under which her husband masqueraded but which she herself never used, she would be prejudiced before the jury because "persons masquerading under aliases usually do so to hide their real identity; that only crooks and criminals adopt aliases, and that the mere scintilla of an alias will cause an erroneous impression upon the jury when said indictment is read to them." No proof was offered in support of the motion or plea in abatement. Both were overruled. These rulings of the court are not complained of in the motion for new trial nor is the sufficiency of the indictment there questioned. Unless, therefore, the indictment on its face is fatally defective, we need give it no further consideration. In our opinion the naming of defendant in the manner shown does not render it fatally defective.

II. Appellant's first assignment of error in her motion for new trial is that the verdict is against the law. Why or in what way it is against the law is not pointed out and we have been unable to discover.

III. The second ground alleged is that the verdict is against the evidence and the greater weight of the evidence. In our statement of the facts we have set out the substance of the evidence bearing upon the homicide. If the admissions and confession of defendant were properly admitted in evidence, a point to be discussed presently, it is apparent that there was substantial evidence upon which to submit the question of defendant's guilt or innocence to the jury and the credibility of the witnesses and the weight to be given their testimony were matters for the jury to determine.

The third and fourth grounds of the motion are that the court erred "in excluding competent, relevant and material evidence offered in behalf of defendant," and "in admitting incompetent, irrelevant and immaterial evidence offered on behalf of the State, over the objections and exceptions of defendant." No specific rulings are pointed out, nor is the evidence claimed to have been erroneously admitted or excluded in any way identified or referred to in the motion so as to call to the court's attention what rulings upon the admission and exclusion of evidence are complained of. These assignments in the motion are insufficient to present for review the matters therein sought to be preserved. [State. v. Ackerman, 285 S. W. 739; State v. Standifer,

1248

316 Mo. 49, 289 S. W. 856; Sec. 4079, Laws 1925, p. 198.] However, we have examined the record and find nothing in the court's rulings on the admission and exclusion of evidence that would justify reversal on those grounds. The fifth allegation is that the verdict is the result of bias and prejudice of the jury. This assignment is without merit.

IV. Appellant contends that the confession introduced in evidence should not have been admitted because the evidence shows that at the time of signing it she was in such condition mentally and physically that she did not know what she was signing and further that it was not voluntarily made. The objection made to its admission at the trial was that it was procured by fraud in that the officers led her to believe it was a bond. Before this confession was offered the officer who took defendant to the police station had testified without objection to the verbal admissions alleged to have been made by her there, before the confession was reduced to writing and signed. When the written confession was offered the court, at defendant's request, sent the jury out of the court room and heard evidence on the question of whether the confession was voluntary or not. He decided that it was voluntary and that defendant knew what she was signing and that it was admissible, and thereupon recalled the jury and permitted the confession to be introduced. Evidence *pro* and *con* on the question was given to the jury as stated briefly in substance in our statement of facts. Defendant made no claim in her testimony, either to the court or to the jury, that she was in any way abused, threatened or intimidated. Her only contention was that she was told by the officers that it was a bond and that it was not read to her and she was too nervous and excited to read it herself; in all of which she was contradicted by all of the officers present when it was signed, of whom there were at least three. Defendant does not claim that she is unable to read. After a careful examination of the somewhat lengthy evidence on this point, we are convinced that there was no error in the admission of the confession. [State v. Williams, 274 S. W. 427, 1. c. 432; State v. Saale, 274 S. W. 393, 1. c. 397; State v. Lee, 288 Mo. 41, 1. c. 51, 231 S. W. 619.]

V. In an instruction given at defendant's request, the jury were told, and we think sufficiently, that before they could consider the confession they must find that it was made voluntarily without the use of violence or fear of violence and without any offer of reward, immunity or leniency and that if they found that at the time she signed it defendant was nervous and hysterical and did not know what she was signing and thought

she was signing a bond, they might disregard any part or all of the confession. If there is any error in the wording of the instruction, defendant cannot complain as it was given in the form requested by her, and she makes no complaint as to the sufficiency of this instruction in her motion for new trial.

VI. Appellant complains of error in permitting the assistant district attorney to propound certain impeaching questions to a female witness and, upon her negative answer, to say he would prove it. The prosecutor's remark was improper, but there was no objection offered to the question and no exception saved to the prosecutor's statement, hence the court cannot be convicted of error on that account. [State v. Scanlon, 308 Mo. 683, 273 S. W. 1063; State v. Henderson, 284 S. W. 799.] Moreover, this witness's testimony was only as to defendant's intemperate and shiftless habits and his previous assaults upon his wife, and was cumulative, there being a great deal of evidence, all practically undenied, on the same points, so that had the witness been completely discredited it could not have affected the result and the error could not have been prejudicial.

VII. The eighth and ninth grounds alleged for new trial are that the court should have sustained defendant's demurrers at the close of the State's evidence and at the close of all the evidence, respectively. As we hold that defendant's admissions and confession were properly admitted in evidence it is needless to discuss these assignments. Obviously the State made a submissible case.

VIII. Assignments Nos. 10 and 11 in the motion for new trial may be considered together. Number 10 is directed against the giving of State's Instruction No. 1. The instruction properly defines murder in the second degree, following approved forms. [State v. Myers, 221 Mo. 598, 121 S. W. 131.] Defendant assails it upon the sole ground that there is no sufficient evidence showing defendant to be guilty of murder in the second degree. Assignment number 11 alleges error in the giving of Instruction No. 2, dealing with the presumption which arises from the intentional use of a deadly weapon upon another in a vital part from which death results. Summarized, the grounds of objection are: That the facts were put in evidence and no reason existed for indulging any presumption as to whether the killing was or was not murder in the second degree; that the instruction required defendant to meet the testimony of the State's witnesses and also the presumption which the court told the jury might be drawn from an "ad-

ditional'' (intentional?) killing; and that it placed the burden upon defendant of repelling the presumption, and was further erroneous in that it limited defendant in meeting or repelling the presumption "to evidence introduced on behalf of the State, whereas the defendant to meet or repel the presumption indulged by said instruction has the right to meet and repel the presumption by evidence introduced on behalf of the defendant as well as by evidence introduced on behalf of the State.''

Instruction No. 2 reads as follows:

"The court further instructs you that if you find and believe from the evidence that the defendant intentionally killed the deceased by striking, cutting, stabbing and wounding him with a knife in the manner set forth in the foregoing instruction, and that the said knife was a deadly weapon, then the law presumes that such killing was murder in the second degree, in the absence of proof to the contrary, and it devolves upon the defendant to meet or repel that presumption, unless such presumption is met or repelled by evidence introduced on behalf of the State.''

In State v. Snow, 293 Mo. 143, l. c. 149, 238 S. W. 1069, it is correctly said:

"The general rule is that a presumption of murder in the second degree arises from an intentional killing of a human being by another where a deadly weapon is used by him at a vital part of the body, absent proof of other facts tending to show deliberation to raise such killing to first degree murder or to show want of premeditation and malice to reduce the killing to manslaughter or to show that such killing was excusable or justifiable.''

In the instant case the jury were required to find, in order to apply the presumption referred to, that deceased was killed with a deadly weapon. They could not have found otherwise under the evidence. [See State v. Bowles, 146 Mo. 6, 47 S. W. 892.] It was used upon a vital part of the body and, from defendant's admissions and confession and the circumstances shown, there was evidence upon which to base a finding that defendant so used it with intent to kill. The jury were required by the instruction to find that defendant intentionally killed deceased. Of course, if defendant's testimony at the trial was true, there was no intentional use of the knife by her. But the jury, whose province it was to determine that question, evidently disbelieved the testimony of defendant and her daughter on that point. Other than those two there was no witness who testified to the circumstances attending the homicide. In such circumstances the rule above quoted applies and instructions in substantially the same language have frequently met the approval of this court. [State v. Evans, 124 Mo. 397, 28 S. W. 8; State v. Elliott, 98 Mo. 150, l. c. 158, 11 S. W. 566; State v. Minor, 193 Mo. 597, l. c. 610-12, 92

S. W. 466.] The criticism that the instruction as worded limits defendant in meeting or repelling the presumption to evidence introduced on behalf of the State is not justified. It requires her to meet or repel the presumption (of course by any competent evidence, not merely her own *testimony*) unless it is met or repelled by the evidence on the part of the State. The facts of this case bring it within the rule followed in the cases above cited and distinguish it from State v. Swearingen, 269 Mo. 177, 190 S. W. 268, where all of the facts and circumstances attending the homicide were testified to by eye witnesses and it was held that there was no necessity or room for the presumption.

IX. Appellant charges error in certain parts of the instruction given on self-defense. We think the instruction is not subject to the criticisms made against it, but shall not discuss them because the transcript certified here shows that this instruction was given at the instance of defendant and the error therein, if any, was self-invited.

X. Appellant also charges error in the giving of Instruction No. 8, for that it singles out defendant "as a witness and unlawfully comments upon statements made by her and the probative effect to be given to such statements." The instruction does not refer to defendant as a witness nor to her testimony. It is the standard form of instruction relative to statements voluntarily made out of court and need not be set out. This instruction in similar form has been approved by this court many times. See State v. Hamilton, 263 S. W. 127, l. c. 131 and cases cited; State v. Simenson, 263 Mo. 264, 172 S. W. 601 and cases cited. We rule the point against appellant.

XI. Finally, appellant asks that a new trial be granted because "she has now discovered new evidence which is relevant, competent, material and important, and which she could not by the exercise of reasonable diligence on her part have procured upon her trial, said evidence not being cumulative, and which would probably produce a different result if a new trial were awarded her." And she asks ten days in which to file affidavits in support of this ground of her motion for new trial. The record shows that the leave prayed for was given, but no affidavits were filed, not even that of defendant herself. This allegation of the motion is obviously insufficient. It states nothing but conclusions, does not show any diligence or set out or even intimate what the newly-discovered evidence was, or any facts from which its materiality or competency would appear. This assignment does not merit further discussion. For the requisites of an ap-

plication for new trial on the ground of newly-discovered evidence, see State v. Miller, 144 Mo. 26, 45 S. W. 1104; State v. Whitsett, 232 Mo. 511, l. c. 523, 134 S. W. 555; State v. Ackerman, supra.

The verdict and judgment are in proper form and sufficient. We have examined carefully the record and considered all of the assignments in defendant's motion for new trial and find no prejudicial error. The judgment is therefore affirmed. *Davis* and *Henwood*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.