234 S.W.2d 535 (1950)
STATE
v.
LOSTON.
No. 41934.
Supreme Court of Missouri, Division No. 1.
November 13, 1950.
Rehearing Denied December 11, 1950.
*536 Morris A. Shenker, St. Louis, for appellant.
J. E. Taylor, Atty. Gen., R. Wilson Barrow, Asst. Atty. Gen., for respondent.
LOZIER, Commissioner.
Appellant (hereinafter called defendant) was convicted of manslaughter and sentenced to ten years imprisonment. On this appeal she assigns: insufficiency of the evidence; improper admission of evidence; failure to instruct as to suicide, self-defense and circumstantial evidence; and erroneous instructions as to accident and use of an "alias."
Defendant offered no evidence. The state's case was: Ben Washington, the deceased, died in St. Louis City Hospital No. 2, February 8, 1948, as a result of shotgun pellet wounds. He had sustained such wounds that morning while in the apartent where he and defendant lived. This was a ground floor, two-room apartment at 2216 Delmar. The west room, the kitchen, was about 14 feet wide and 12 feet long. Its one outside door was on the west, and it had at least one window, apparently on the south. Along its east wall was a cookstove, and through such wall was a door into the bedroom on the east. Somewhere in the kitchen was a sink (apparently on the north wall), a 3 by 5 or 6 foot table (on either the east or south wall) and 3 or 4 chairs.
Zella Brown testified: that on that morning she, defendant and Hattie Lester were in the kitchen when Ben came into the room; that it was cold that day and she (Zella) and Hattie were sitting in chairs near the stove warming their feet and that defendant was standing by the stove; that Ben came into the kitchen through the outside door, walked to a spot by the stove and said, "Good morning"; that she never heard Ben say anything after that; that he was "warming his hands"; that Zella and Hattie said, "Good morning"; that defendant said to Ben, "What are you standing there looking so sanctified?" and Ben "just said, `Oh, Miss Martha'," and he "still stood there"; that defendant then said, "You are standing there so sanctified, I am going to kill you"; that neither defendant nor Ben said anything else; that Ben "didn't do nothing; just stood there where he was standing"; that defendant walked into the other room and "got the shotgun," returned and stood right there * * * in front of him"; that she "wasn't gone nary a minute"; that Ben "just stood there with his back to the stove"; that neither Ben nor defendant said anything; that she (Zella) sat there, head down, looking at the floor "with my feet down this way (indicating), trying to warm them and Hattie went out of the room * * * and slammed the door. And when she slammed the door I heard the gun fire and I jumped right straight up, and I went right on out of there. It like to scared me to death because that gun jarred my head"; that she (Zella) was looking down when the gun went off and she didn't "know whether she (defendant) shot the gun or him"; that after she (Zella) ran out, defendant called her back and asked her to call the police; *537 and that she saw no injuries or wounds on defendant that morning. On cross-examination Zella said she had seen the shotgun "when she (defendant) first got it, in the summertime." Zella gave no response to two questions as to when she had first seen the gun that morning; and then said she didn't see it, first, until defendant "came out of the house that morning," later, until "they carried it down to headquarters," and, finally, "until they had it at headquarters."
Officer McCallum and his partner, Broussard, arrived on the scene within a very short time. They found Ben on the kitchen floor, bleeding and unconscious, and defendant standing in the kitchen. McCallum asked her what had happened and she said "Ben Washington had shot himself. * * * I asked, `How did he shoot himself?' and she said, `He had the gun in his hand.' * * * She said that she had attempted to take the shotgun from him and the gun went off and wounded Ben Washington. * * * I asked her, `Where is that gun?' She said, `It is in the other room, I guess, I don't know where I put it.'" McCallum and defendant went into the bedroom where he saw the gun standing in a corner. McCallum handed it to another officer, Burgoon (who had arrived at the scene after McCallum), in defendant's presence. Burgoon placed identification marks upon the gun.
McCallum saw an empty shotgun shell lying in blood on the kitchen floor, a short distance from Ben's arm. This was also observed by Officers Flynn, Burgoon and Barnhart. Flynn marked it for identification purposes. Sgt. Ruff, police ballistics expert, testified that, in his opinion, based upon test firing of the gun, that particular shell had been fired from that shotgun.
In response to Officer Flynn's inquiry as to what had happened, defendant stated that she had been showing the gun to two friends in the kitchen, that Ben came in and grabbed the gun with his right hand and that it was discharged; and that Ben had said, "Give me that gun" when he grabbed it. Burgoon testified that later defendant stated to him that "she had the gun showing it to some friends and Ben Washington came in and attempted to take the gun from her and that the gun went off accidentally."
Vincent McCormick, deputy sheriff, testified as to a non est return upon a state's subpoena for Hattie Lester. The testimony of Dr. Russell White is hereinafter referred to.
In contending here that the state failed to make a submissible case, defendant bases her argument solely upon the portions of Zella's testimony favorable to her. Defendant says: "Certainly the testimony of the officers and the physician could not in any way sustain the burden of proof which is cast upon the state in this cause to prove beyond a reasonable doubt the charges which it has imposed upon the defendant, and the testimony of the only other witness, namely, Zella Brown, could in no way sustain this burden of proof. Certainly there was no showing by the state of any malice or wilfullness or premeditation on the part of the defendant at the time of the alleged shooting. Certainly there was no evidence at all that the defendant ever, at any time, had a shotgun in her hands or that she ever fired a gun at the deceased. Certainly there was no evidence that the death of Ben Washington resulted by reason of the actions of Martha Loston."
This argument is directed against the weight of the evidence and not against its sufficiency to make a submissible case. Determination of defendant's guilt or innocence was for the jury. The state was required only to produce "substantial evidence to sustain the conviction", State v. Harmon, Mo.Sup., 296 S.W. 391, 395, or evidence upon which the "jury reasonably could find the issue thereon". State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, 52. We have summarized the evidence and think that the state's evidence was substantial. It is sufficient to refer only to the evidence as to defendant's statement ("I am going to kill you") to deceased prior to the shooting, and her voluntary statements to police officers both before and after her arrest. The weight and credibility of Zella Brown's testimony was for the jury. State *538 v. Harmon, supra. We rule this assignment against defendant.
Defendant has briefed and argued here the propriety of the court in permitting, over her objection, a doctor on the city hospital staff, Russell White, to testify. Dr. White had examined defendant after her arrest. It is defendant's position that such examination violated her constitutional rights against self-incrimination. However, she has not preserved this issue for our review. It was not assigned as error in her motion for new trial. State v. Davis, Mo.Sup., 196 S.W.2d 629.
Defendant assigns as error the failure to instruct upon suicide and self-defense. There was no evidence whatever which would have justified the giving of an instruction as to either of these matters.
Defendant also contends that the court erred in "failing to give to the jury a requested instruction dealing with the law of circumstantial evidence." Examination of the transcript shows that defendant did not request this, or any other instruction. Defendant asserts that there was no direct proof or evidence of the essential elements of the offense charged and: "If, then, it is determined that the evidence in this case as presented by the state is circumstantial in nature, it thereupon becomes the duty of the trial court to instruct upon the law as it applies to circumstantial evidence." (Italics ours.)
Such an instruction is not mandatory under Sec. 4070, Mo.R.S.1939, and Mo. R.S.A. where at least part of the state's evidence is direct. State v. Famber, 358 Mo. 288, 214 S.W.2d 40; State v. Mansker, 339 Mo. 913, 98 S.W.2d 666; and State v. Mangercino, 325 Mo. 794, 30 S.W.2d 763. The cases cited by defendant announce and apply this principle.
Had defendant requested such an instruction its refusal would not have been error, as the state's evidence was not wholly circumstantial. State v. Hutsel, 357 Mo. 386, 208 S.W.2d 227; State v. Cole, Mo. Sup., 188 S.W.2d 43; State v. Foster, 355 Mo. 577, 197 S.W.2d 313. And see Missouri cases cited, 23 C.J.S., Criminal Law, § 1250, note 26, page 811.
Here the state's case was based chiefly upon the direct evidence of a witness present at the time of the tragedy. Zella Brown was sitting within a few feet of defendant and deceased. She heard defendant's threat and heard the gun fired. In her direct examination she said she saw defendant go into the other room and return with the gun. This was direct evidence of a witness present in the kitchen that morning who saw and heard everything except what happened immediately before the fatal shot was fired. That she had her head down when the gun was discharged, and that she did not see whether deceased grabbed the gun, does not make her testimony as to other facts "circumstantial evidence." See State v. Famber, supra, and authorities cited therein. Furthermore, defendant's admissions alone were sufficient to justify refusal of a circumstantial evidence instruction. See State v. Tucker, 339 Mo. 101, 96 S.W.2d 21; State v. Criger, Mo.Sup., 46 S.W.2d 537; and State v. Crawford, Mo.Sup., 289 S.W. 961.
Defendant next challenges the sufficiency of the instructions as to accident. The murder instruction contained these words: "unless you find the defendant not guilty on the ground of accident, as defined in another instruction or instructions given you," and the manslaughter instruction: "and under such circumstances that it is not the result of an accident, as defined in other instructions." (Italics ours.) There was no instruction purporting to define "accident."
However, the jury were instructed that "`excusable homicide' as used in these instructions, means the accidental killing of another." Conversely, an accidental killing is thus defined as an excusable homicide. If, as we have said, this definition of excusable homicide is favorable to a defendant, State v. Whited, 360 Mo. 962, 231 S.W. 2d 618, it would seem that this negative definition of accidental killing would also be favorable to a defendant.
*539 Furthermore, the following instruction was given: "The court instructs the jury that the defense in this case is that if the defendant did shoot the deceased that such shooting was an accident, and you are instructed that the defendant is not required to prove that it was an accident, but the burden of proof is upon the state to show that it was not an accident but that the said shooting was intentionally done by the defendant with the intention of shooting the deceased or some other person, and that the state must make this proof beyond a reasonable doubt, and unless the state has so made this proof, then you should acquit the defendant of both murder in the second degree and manslaughter."
This instruction (set out in 2 Raymond, Mo.Inst.Juries, Sec. 5951) was approved in State v. Markel, 336 Mo. 129, 77 S.W.2d 112, as adequately presenting a defendant's theory of accidental killing. In the instant case, it was the converse of the state's main instructions. See State v. Ledbetter, 332 Mo. 225, 58 S.W.2d 453. In a sense, it defined "accident" by emphasizing the defendant's intention, which was the vital issue in the case.
In State v. Gaskins, Mo.Sup., 89 S.W.2d 647, we said that an instruction which did not define "accident" properly submitted the defense of accidental killing. That case is cited in State v. Bradley, 352 Mo. 780, 179 S.W.2d 98, 101, as one not involving affirmative misdirection but involving "mere nondirection or poorly phrased proper direction", requiring the defendant to request clarifying instructions.
Reading all the instructions together, State v. Sapp, 356 Mo. 705, 203 S. W.2d 425, we are convinced that the jury was not misled by the phrase "accident as defined in other instructions." In our opinion, the law relating to defendant's accident defense, was adequately and fairly submitted to the jury, and the use of the phrase was in no way prejudicial to her case.
The opening sentence of Instruction No. 1 was: "The State of Missouri, by the indictment in this case, which was filed in this court on the 2nd day of April, 1948, charges the defendant, Martha Loston, alias Martha Washington, * * *." Defendant objected to the giving of this instruction, and preserved the objection in her motion for new trial, on the ground that there was no testimony that defendant was known by both names and that the use of an "alias" was prejudicial to her in that it created an inference that defendant had a criminal record.
However, defendant ignores the testimony of Zella Brown that she had known defendant 5 or 6 years, and deceased 3 or 4 years; had been to "their home most every day," and was at "their home" at 2216 Delmar on February 8, 1948. Officer Flynn testified that deceased resided at that address. Obviously, defendant and deceased had been living together in the apartment for several years prior to the tragedy. Under such circumstances, it is a reasonable inference that defendant was known as or referred to as "Martha Washington" or "Mrs. Washington."
But even if there was no evidence of defendant's alias, we cannot see that she was prejudiced by the reference thereto. While this court has criticised the use of an alias in instructions in a criminal case where unauthorized by the evidence, State v. Richards, 334 Mo. 485, 67 S.W.2d 58, it has never, so far as we have been able to ascertain, reversed a conviction because of such reference.
"Alias" means "or" or "otherwise called" or "otherwise known as." 3 Words and Phrases, Perm.Ed., page 82, "Alias" and "Alias Dictus." The purpose of its use in criminal proceedings is that of identification of a person (usually but not always the defendant). Proof or absence of proof of an alias is not material as to proof or failure of proof of the crime charged. Petrilli v. U. S., 8 Cir., 129 F.2d 101. Its use does not make an indictment fatally defective. State v. Eason, 322 Mo. 1239, 18 S.W.2d 71.
In the Petrilli case, the reading of the indictment setting forth 28 aliases was criticised, and in D'Allessandro v. U. S., 3 *540 Cir., 90 F.2d 640, 641, it was said: "Another practice which provokes comment is that of loading a defendant with a long list of aliases. * * * None the less the string of aliases may be so arranged as to carry the implication that the defendant belongs to the so-called criminal class and thus half convict him as soon as the indictment is disclosed to the jury." (Italics ours.) A similar argument was made by the defendant in the Eason case, but we did not rule this matter in that case. In all three cases the convictions were affirmed.
Assuming but not deciding that a "large number" (such as 28) or a "long list" or a "string" of aliases carries an implication that the defendant belongs to the so-called criminal class, D'Allessandro case, we do not believe that such an implication can be drawn from the reference to one alias. We are not impressed with the argument made by the defendant in the Eason case (involving, as here, only one alias) that "persons masquerading under aliases usually do so to hide their real identity; that only crooks and criminals adopt aliases, and that the mere scintilla of an alias will cause an erroneous impression upon the jury * * *." [322 Mo. 1239, 18 S.W.2d 75.] Aliases are not always "chosen" or "adopted"; they are not always the result of masquerade. They are often "conferred," sometimes against the will of the conferee or even, possibly, without his knowledge.
Our study of the record has convinced us that the reference in the instruction to defendant as "alias Martha Washington" was authorized by the evidence, and did not suggest that defendant had a criminal record. In instances such as this (where a defendant has made timely objection and has preserved the issue in his motion for new trial), we should follow the principle announced and applied in the Petrilli case: "But where, as here, a reference to the aliases has crept into the proceedings, the situation on appeal will not be controlled by the application of any abstract principle, but by a concrete appraisal of the significance of the incident in relation to the processes of the trial as a whole." [8 Cir., 129 F.2d 104.]
The evidence supports the conviction and there was no reversible error. Accordingly, the judgment is affirmed.
VAN OSDOL and ASCHEMEYER, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.